## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 21-30710 |
| **CASTEX ENERGY 2005 HOLDCO,** | § | |
| **LLC,** *et al.*, | § | **Chapter 11** |
| | § | |
| Debtors. [1] | § | (Jointly Administered) |

### DISCLOSURE STATEMENT IN SUPPORT OF JOINT CHAPTER 11 PLAN

Matthew S. Okin
Texas Bar No. 00784695
David L. Curry, Jr.
Texas Bar No. 24065107
Ryan A. O'Connor
Texas Bar No. 24098190
Johnie A. Maraist
Texas Bar No. 24109505
**OKIN ADAMS LLP**
1113 Vine St., Suite 240
Houston, Texas 77002
Tel: 713.228.4100
Fax: 888.865.2118
Email: mokin@okinadams.com
Email: dcurry@okinadams.com
Email: roconnor@okinadams.com
Email: jmaraist@okinadams.com

**PROPOSED ATTORNEYS FOR THE DEBTORS**

Dated:  March 8, 2021

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Castex Energy 2005 Holdco, LLC (6832); Castex Energy 2005, LLC (6832); Castex Energy Partners, LLC (6832); and Castex Offshore, Inc. (8432).  The Debtors' mailing address is One Memorial City Plaza, 800 Gessner Rd., Suite 925, Houston, Texas 77024.

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE DEBTORS' JOINT CHAPTER 11 PLAN, DATED AS OF MARCH 8, 2021 (AS AMENDED FROM TIME TO TIME, THE "PLAN"), AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR SECURITIES LAWS OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS. ANY CREDITOR OR OTHER PARTY BUYING OR SELLING A CLAIM BASED ON THE INFORMATION CONTAINED HEREIN, DOES SO AT ITS OWN RISK.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. IN ADDITION, THIS DISCLOSURE STATEMENT AND THE PLAN HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING OR SELLING OR TRANSFERRING SECURITIES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE ENTIRE DISCLOSURE STATEMENT FURNISHED TO THEM AND THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT PRIOR TO SUBMITTING A BALLOT.  THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ, CONSIDER, AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.

THE DEBTORS HAVE ATTEMPTED TO PRESENT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ACCURATELY AND FAIRLY. THE ASSUMPTIONS UNDERLYING THE ANTICIPATION OF FUTURE EVENTS CONTAINED IN THIS DISCLOSURE STATEMENT REPRESENT AN ESTIMATE BY THE DEBTORS, BUT BECAUSE THESE ARE ONLY ASSUMPTIONS OR PREDICTIONS OF FUTURE EVENTS (MOST OF WHICH ARE BEYOND THE DEBTORS' CONTROL), THERE CAN BE NO ASSURANCE THAT THE EVENTS WILL OCCUR.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THIS DISCLOSURE STATEMENT AND IN THE PLAN CONCERNING THE HISTORY OF THE DEBTORS' BUSINESSES, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTORS, CERTAIN PROJECTIONS FOR THE FUTURE OPERATIONS OF THE DEBTORS, TRANSACTIONS TO WHICH EITHER DEBTORS WAS OR IS A PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTORS AND NOT TO ANY OTHER PARTY.  NONE OF THE ATTORNEYS, ACCOUNTANTS, OR OTHER PROFESSIONALS RETAINED BY THE DEBTORS MAKE ANY REPRESENTATIONS CONCERNING SUCH INFORMATION.

NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.  SUCH ADDITIONAL REPRESENTATIONS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR ACTION AS MAY BE DEEMED APPROPRIATE.  THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.  THIS DISCLOSURE STATEMENT IS DATED AS OF MARCH 8, 2021, AND HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ENCOURAGED TO REVIEW THE DOCKET IN THE CHAPTER 11 CASES IN ORDER TO APPRISE THEMSELVES OF EVENTS WHICH OCCUR IN THE CHAPTER 11 CASES BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE DATE OF THE CONFIRMATION HEARING.

THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN ARE SET FORTH IN THE SECTION OF THIS DISCLOSURE STATEMENT TITLED "CONFIRMATION REQUIREMENTS."

UNLESS OTHERWISE DEFINED HEREIN, ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.  ANY TERM USED IN THE PLAN OR HEREIN THAT IS NOT DEFINED IN THE PLAN OR HEREIN AND THAT IS USED IN THE BANKRUPTCY CODE OR THE BANKRUPTCY RULES HAS THE MEANING ASSIGNED TO THAT TERM IN THE BANKRUPTCY CODE OR THE BANKRUPTCY RULES, AS THE CASE MAY BE.  IF THERE IS ANY CONFLICT BETWEEN THE DEFINITIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE DEFINITIONS CONTAINED IN THE PLAN, THE DEFINITIONS CONTAINED IN THE PLAN SHALL CONTROL.

**THE PLAN PROPOSES EXCULPATION FROM LIABILITY AS TO THE DEBTORS AND VARIOUS NON-DEBTOR PARTIES AND RELEASES AS TO VARIOUS NON-DEBTOR PARTIES FOR CERTAIN PRE- AND POST-PETITION ACTIONS IN CONNECTION WITH THE CHAPTER 11 CASES, WHICH PROVISIONS WOULD ENJOIN THE DEBTORS, HOLDERS OF CLAIMS, AND HOLDERS OF EQUITY INTERESTS FROM PURSUING CERTAIN ACTIONS AGAINST SUCH PARTIES EXCEPT AS OTHERWISE PROVIDED IN THE PLAN.  ALL PARTIES IN INTEREST ARE URGED TO READ CAREFULLY ARTICLE VII OF THE PLAN ON EXCULPATION FROM LIABILITY AND RELEASES.**

**DISCLOSURE STATEMENT
PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE**

## I.   INTRODUCTION

Castex Energy 2005 Holdco, LLC *et al.*, as Debtors and Debtors-in-Possession in the above-captioned jointly administered Chapter 11 Cases, have filed with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"), their Joint Chapter 11 Plan (as may be amended, the "Plan"),[2] dated as of March 8, 2020.  This Disclosure Statement is submitted pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes on the Plan from Holders of Impaired Claims against the Debtors.

This Disclosure Statement has been conditionally approved by the Bankruptcy Court in accordance with section 1125(b) of the Bankruptcy Code as containing information of a kind and in sufficient detail adequate to enable a hypothetical reasonable investor typical of Holders of Claims in Impaired Classes, if any, to make an informed judgment whether to accept or reject the Plan.  Such approval of this Disclosure Statement by the Bankruptcy Court and the transmittal of this Disclosure Statement do not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan and should not be interpreted as being a recommendation by the Bankruptcy Court either to accept or reject the Plan.

Accompanying or included as an exhibit to this Disclosure Statement is a copy of the Plan, including any Exhibits thereto (except as otherwise expressly provided in the Plan), included as Exhibit 1 to this Disclosure Statement.  A Liquidation Analysis, list of payments made by the Debtors during the 90-day period prior to the Petition Date, list of payments made by the Debtors during the 90-day period prior to the Petition Date, Schedule of Retained Causes of Action, and Claim Liability Report will be included in the Plan Supplement to be filed at least ten (10) days before the Confirmation Hearing.

## II.      PURPOSE OF THIS DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide the Holders of Claims entitled to vote on the Plan with adequate information to make an informed judgment about the Plan.  This information includes, among other things, (a) a summary of the Plan and an explanation of how the Plan will function, including the means of implementing and funding the Plan, (b) general information about the businesses, property, and operations of the Debtors, (c) the events leading to the filing of the Chapter 11 Cases, and (d), a summary of significant events which have occurred to date in the Chapter 11 Cases.

This Disclosure Statement contains important information about the Plan and considerations pertinent for Confirmation of the Plan.  All Holders of Claims and Equity Interests are encouraged to review carefully this Disclosure Statement.

IN THE OPINION OF THE DEBTORS, THE TREATMENT OF CLAIMS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER A LIQUIDATION OF THE DEBTORS.  ACCORDINGLY, THE

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

## III.     VOTING AND CONFIRMATION

**A.     <u>Who May Vote</u>**

Only the Holders of Claims a which are "Impaired" under the terms and provisions of the Plan are permitted to vote to accept or reject the Plan.  For purposes of the Plan, only the Holders of Claims in Classes 3 and 4 (the "Voting Classes") are Impaired under the Plan and thus may vote to accept or reject the Plan.  **Accordingly, a ballot for acceptance or rejection of the Plan (a "Ballot") is only being provided to members of the Voting Classes.  A Notice of Non-Voting Status will also be provided to Non-Voting Classes which shall provide for an "Opt-Out" of the releases set forth in Article VII.G. of the Plan.**

**B.     <u>How to Vote</u>**

Each Holder of a Claim in a Voting Class should read this Disclosure Statement, together with the Plan and any Exhibits thereto, in their entirety.  After carefully reviewing the Plan and this Disclosure Statement and any Exhibits thereto, please complete the enclosed Ballot, including marking your vote with respect to the Plan, and return it as provided below.  If you have an Impaired Claim in more than one Class, you should receive a separate Ballot for each such Claim. If you receive more than one Ballot, you should assume that each Ballot is for a separate Impaired Claim and you should complete and return all such Ballots.

If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact Matthew S. Okin, counsel to the Debtors, by telephone at (713) 228-4100 or by electronic mail at mokin@okinadams.com.

Persons or Entities receiving a Ballot should complete and sign each enclosed Ballot and return it to the address provided below. **In order to be counted, Ballots must be duly completed, executed and received no later than April [___], 2021 (the "Voting Deadline").**  All Ballots should be returned either by regular mail, hand delivery, overnight delivery, or email to:

Donlin, Recano & Company, Inc.
Re: Castex Energy 2005 Holdco, LLC, *et al.*
P.O. Box 199043 Blythebourne Station
Brooklyn, NY 11219
Toll Free Tel: 1 (866) 627-2882
Fax: 1 (212) 481-1416
Email: castexinfo@donlinrecano.com

**C.**     <u>**Acceptance of Plan and Votes Required for Class Acceptance**</u>

As the Holder of a Claim in a Voting Class, your vote on the Plan is extremely important. The Debtors are only soliciting acceptances of the Plan from Holders of Claims in Voting Classes. You may be contacted by the Debtors or their representatives with regard to your vote on the Plan.

Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if:

(i)     the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan; and

(ii)    the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan.

To meet the requirement for Confirmation of the Plan under the "cram-down" provisions of the Bankruptcy Code with respect to any Impaired Class of Claims which votes to reject, or is deemed to have rejected, the Plan (a "Rejecting Class"), the Debtors would have to show that all Classes junior to the Rejecting Class will not receive or retain any property under the Plan unless all Holders of Claims in the Rejecting Class receive or retain under the Plan property having a value equal to the full amount of their Allowed Claims.  For a more complete description of the implementation of the "cram-down" provisions of the Bankruptcy Code pursuant to the Plan, see "VOTING ON AND CONFIRMATION OF THE PLAN -- Confirmation Without Acceptance by All Impaired Classes" in Section XX.B hereof.

**D.**     <u>**Confirmation Hearing and Objections to Confirmation**</u>

The Bankruptcy Court has scheduled a Confirmation Hearing to consider Confirmation of the Plan for [_____], 2021 at [__]:00 [_.]m. (Prevailing Central Time), at the courtroom of the Honorable Marvin Isgur, United States Bankruptcy Court, 515 Rusk, Courtroom No. 404, Houston, Texas 77002, which may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to Confirmation of the Plan must be filed and served in accordance with the Bankruptcy Rules and Bankruptcy Local Rules for the Southern District of Texas no later than [_____], 2021.

### IV.     2017 CHAPTER 11 CASES

On October 16, 2017, Castex Energy Partners, L.P., Castex Offshore, Inc. ("COI"), Castex Energy 2005, L.P., Castex Energy II, LLC, and Castex Energy IV, LLC (collectively, the "Prior Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "2017 Chapter 11 Cases") in this Bankruptcy Court styles as *In re Castex Energy Partners, L.P., et al.*, jointly administered under Case No. 17-35835 (Bankr. S.D. Tex. 2018).

On February 27, 2018, this Court entered an order (the "2018 Confirmation Order") confirming the Prior Debtors' third amended plan of reorganization (the "2017 Chapter 11 Plan"). *See* ECF # 448, Case No. 17-35835 (MI) (Bankr. S.D. Tex. Feb. 27, 2018).  The 2017 Chapter 11 Plan became effective on March 14, 2018 (the "2018 Effective Date").  As more fully described below, pursuant to the 2017 Chapter 11 Plan and 2018 Confirmation Order, Castex (defined below) was formed to be a holding company for the reorganized debtors under the 2017 Chapter 11 Plan while certain Prior Debtors converted to different entity types and changed their names. Additionally, pursuant to the 2017 Chapter 11 Plan and 2018 Confirmation Order, among other things, on the 2018 Effective Date, the participants in a reserve-based lending facility that predated the 2017 Chapter 11 Cases received their ratable share of (a) substantially all of the equity in Castex, the holding company for the reorganized Prior Debtors and their successors, and (b) an exit reserve-based facility in a reduced amount as compared to their prior indebtedness, and which was, and continues to be, secured by liens and security interests in substantially all of the assets of the Debtors as set forth in the Prepetition Credit Agreement (as defined below) and related lending and security documents.

The 2017 Chapter 11 Plan has been fully consummated, and the terms thereof fully implemented with one exception.  The 2017 Chapter 11 Plan provided that allowed general unsecured claims would receive their pro rata share of $750,000 which amount was deposited into a separate account for their benefit (the "2017 Chapter 11 Unsecured Creditor Reserve").  All potential claims against that fund have been resolved, with the exception of a claim by Apache Corporation ("Apache") and the claim to any residual funds by 2018 Allowed Section 510(b) Claims (as defined in the 2018 Confirmation Order).  As described in more detail below, after a July 2019 jury trial in Texas State District Court, a judgment was entered against Apache in favor of certain Debtors in the approximate amount of $69.5 million.  However, Apache appealed that judgment, which remains pending as of the Petition Date.  In the unlikely event that Apache were ever determined to have a claim against the Debtors that predated the petition date for the 2017 Chapter 11 Cases, Apache may be entitled to a distribution from the 2017 Chapter 11 Unsecured Creditor Reserve.

Further, the 2018 Confirmation Order provided for distribution of any remaining 2017 Chapter 11 Unsecured Creditor Reserve after payment to general unsecured claims to OHA Asset Holdings II, L.P., a holder of a 2018 Allowed Section 510(b) Claim.  *See* 2018 Confirmation Order at ¶14.  The Debtors have not yet determined whether the right to these funds contained in the 2017 Chapter 11 Plan and 2018 Confirmation Order continue post-petition in these Chapter 11 Cases.  As of the Petition Date, the Debtors continue to hold the 2017 Chapter 11 Unsecured Creditor Reserve and will continue to do so until there is a final determination of their status by this Court.  The Debtors' expressly reserve the right to revise the Plan to reflect any determination from this Court regarding the same.

## V.  OVERVIEW OF THE DEBTORS' BUSINESSES

Castex Energy 2005 Holdco, LLC ("Castex") is a Delaware limited liability company, Castex Enery 2005, LLC ("Castex 2005") is a Delaware limited liability company, Castex Energy Partners, LLC ("CEP"), is a Delaware limited liability company, Castex Offshore, Inc. ("COI") is a Texas corporation.  The information contained in this section of the Disclosure Statement provides a summary of the Debtors' formation, corporate structure and history, capital structure, and business operations prior to the Petition Date.  As more fully set forth in this section, the Debtors' history involves the 2017 Chapter 11 Cases, mergers and name changes, the details of which are necessary to understand their organizational structure as of the Petition Date.

### A.      History of the Debtors and Current Organizational Structure

Castex Energy 2005 Holdco, LLC:  Castex, a Delaware limited liability company, was formed on March 2, 2018 in accordance with the 2017 Chapter 11 Plan and 2018 Confirmation Order to be a holding company for the other Debtors (or their predecessors), each of which are directly or indirectly wholly owned by Castex.

Castex Energy 2005, LLC: Castex 2005, a Delaware limited liability company, was originally formed on February 28, 2005, and was originally known as Castex Energy 2005, L.P. On the 2018 Effective Date, pursuant to the 2017 Chapter 11 Plan and 2018 Confirmation Order, the entity converted from a limited partnership to a limited liability company and changed its name to Castex Energy 2005, LLC.  Castex 2005 is the direct, wholly owned subsidiary of Castex.

Castex Energy Partners, LLC: CEP, a Delaware limited liability company, was originally formed in 2007, and was originally known as Castex Energy Partners, L.P.  It was created as a vehicle to acquire producing oil and gas fields and participate in new exploration drilling.  On the 2018 Effective Date, pursuant to the 2017 Chapter 11 Plan and 2018 Confirmation Order, the entity converted from a limited partnership to a limited liability company and changed its name to Castex Energy Partners, LLC.  CEP is an indirect, wholly owned subsidiary of Castex.  CEP's current assets include oil and gas interests in onshore Texas and Louisiana and Louisiana off-shore waters. It also owns interests in two non-Debtor entities, Castex Lafourche, LP and CTS-Castex, LLC. The assets owned by these non-Debtor entities include proprietary interests in certain seismic data (held through CTS-Castex, LLC), and fee land interests in Lafourche Parish, Louisiana (held through Castex Lafourche, LP).

Castex Offshore, Inc.: COI, a Texas corporation, is an indirect, wholly owned subsidiary of Castex.  Although COI was a Prior Debtor, its organizational structure did not change as a result of the 2017 Chapter 11 Plan and 2018 Confirmation Order.  As of the Petition Date, COI holds legal title and acts as designated operator of Castex's federal offshore leases in the Gulf of Mexico.

A corporate organizational chart identifying the Debtors and their non-Debtor affiliates is set forth below:



## B. Prepetition Capital Structure and Trade Debt

Pursuant to the terms of the 2017 Chapter 11 Cases' 2017 Chapter 11 Plan, the Debtors converted a portion of their reserve-based lending facility by distributing to participants in the reserve-based lending facility their ratable share of (a) substantially all of the equity in Castex, the holding company for the reorganized Prior Debtors and their successors, and (b) an exit reserve-based facility in a reduced amount as compared to their prior indebtedness, and which was, and continues to be, secured by liens and security interests in substantially all of the assets of the Debtors as set forth in the Prepetition Credit Agreement (as defined below) and related lending and security documents.

The terms and provisions of the Debtors' remaining reserve-based secured lending facility, pursuant to the 2018 Confirmation Order, are set forth in the Third Amended and Restated Credit Agreement, dated as of March 14, 2018, (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement", and collectively with any other agreements and documents executed or delivered in connection therewith, including the Security Agreement as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Loan Documents"), by and among CEP (in such capacity, the "Borrower"), Castex, and the other persons party thereto as Loan Parties (as defined in the Prepetition Credit Agreement), the financial institutions listed therein (collectively, the "Prepetition Lenders"), and Capital One, National Association, individually as a Secured Lender, as L/C Issuer (as that term is defined in the Prepetition Credit Agreement) and as administrative agent for the Secured Lenders (in such capacity, the "Prepetition Agent" and, together with the Prepetition Lenders and any other party to which Secured Debt Claims (as defined below) are

owed, the "Prepetition Lenders").  Under the Prepetition Credit Agreement, CEP is the Borrower, and each of the other Debtors is a guarantor.  All obligations of the Debtors arising under the Prepetition Credit Agreement or the other Current Loan Documents shall collectively be referred to herein as the "Secured Debt Claims."  The Secured Debt Claims are secured by liens and security interests in substantially all of the Debtors' assets (the "Prepetition Collateral").  As of the Petition Date, the Debtors were in default under the Prepetition Credit Agreement.  The principal amount due on the Secured Debt Claims as of the Petition Date was not less than $199,585,956.

In addition to the Secured Debt Claims owed to the Prepetition Lenders, the Debtors have substantial unsecured debt owed to numerous trade creditors, among others.  In the ordinary course, the Debtors have engaged in numerous strategic relationships with various service providers in relation to their oil and gas operations which are critical to maintaining production. Due to the various liquidity issues described herein, the Debtors do not have sufficient cash flow to pay all of their outstanding trade payables.  As of the Petition Date, the Debtors owed more than $16 million to trade creditors and other unsecured creditors.[3]

## C.    Current Oil and Gas Assets and Operations

As of the Petition Date, CEP and COI owned interests ("Working Interests") in approximately 182 oil, gas, and related wells, and have estimated proved reserves of approximately 2.3 MMBO (oil and gas condensate) and 38.5 BCFE (natural gas).  Certain of the Debtors are also a party to numerous master service agreements, joint operating agreements, joint development agreements, exploration agreements, and area of mutual interest agreements.

The Debtors' Working Interests can be categorized by their location and whether the Debtors serve as the operator of record for such properties.  Generally, the Debtors' Working Interests fall into four (4) broad categories: (a) Offshore Operated; (b) Offshore Non-Operated; (c) Onshore Operated; and (d) Onshore Non-Operated.  The Debtors' proportionate share of the total P&A Obligations (defined below) related to the Working Interests is approximately $36 million. Importantly, this $36 million of potential P&A Obligations are not currently due to be performed, but rather this number reflects an approximation of P&A Obligations that may arise, in the aggregate, over the future life of all Working Interests held by the Debtors - which in some cases range up to 40 years from the Petition Date.  The $36 million in P&A Obligations can be further broken down into the four (4) categories described above, with Offshore Operated being approximately $12.3 million, Offshore Non-Operated being approximately $7.7 million, Onshore Operated being approximately $9.2 million, and Onshore Non-Operated being approximately $6.9 million.

Below is a chart detailing additional financial information (in millions) regarding the P&A Obligations valued on both a PV-0 (current value) and PV-10 basis for each of the four (4) categories described above:

---

[3] This amount does not include any amounts that may be due to sureties for the under secured amounts of P&A bonds.

| LEASES | P&A PV-0% | P&A PV-10% | | PDP PV-0%[1] | PDP PV-10%[1] | Bonds[2] |
|---|---|---|---|---|---|---|
| Offshore Operated | ($12.37) | ($9.13) | | $2.46 | $2.35 | $11.80 |
| Offshore Non-Operated | (7.68) | (4.62) | | 5.93 | 4.63 | |
| Onshore CEI Operated | (6.93) | (4.89) | | 7.70 | 5.91 | 0.30 |
| Onshore Non-CEI Operated | (9.17) | (6.80) | | (2.13) | (1.54) | |
| **Total** | **($36.15)** | **($25.44)** | | **$13.96** | **$11.35** | **$12.10** |

[1] Reserve figures and ARO estimates in this presentation were prepared internally by Debtors at PV-10% and PV-0%.

P2 reserves of $75.3 million and P3 reserves of $377 million at 2-9-21 strip pricing

[2] The Offshore Operated bonds includes $3.6 million in areawide bonds.

As of the Petition Date, the Debtors have approximately $12 million in P&A bonds that can be potentially used to cover the P&A Obligations. The vast majority of these bonds, approximately $11.8 million, relate to the Offshore Operated properties, with approximately $3.6 million of this amount consisting of areawide bonds. The Debtors have approximately $400,000 in P&A bonds covering their Onshore properties, but Castex Energy, Inc., a non-debtor, is the Principal under these bonds, not COI. COI, however, has paid the premiums on these bonds, and it believes that such bonds should be available to offset the P&A Obligations on the Onshore properties.

The Debtors do not have any employees. Instead, the Debtors conduct their business operations by and through a management services agreement with Schooner pursuant to that certain Service Agreement with Schooner Oil and Gas LLC ("Schooner") dated November 21, 2020 (the "Schooner Agreement"). Greg Miller is the chief executive officer of Schooner, who serves on the Debtors' board of directors. Mr. Miller recused himself from the discussions and voting regarding the Schooner Agreement. Pursuant to the Schooner Agreement, Schooner acts as the operator of the Debtors' Working Interests in the oil and gas assets and provides certain general and administrative services required by the Debtors to manage the onshore and offshore oil and gas assets (the "Management Services"). Neither the Debtors or Schooner are aware of any outstanding compliance issues with the Bureau of Ocean Energy Management, the Bureau of Safety and Environmental Enforcement, or health, safety, or environmental issues.

**D.      Intercompany Transactions and Office Leases**

Prior to the Petition Date and presently, the Debtors subleased their corporate headquarters located at One Memorial City Plaza, 800 Gessner Road, Suite #925, Houston, Texas 77024 (the "Corporate Headquarters") from Schooner. Both Schooner and the Debtors jointly occupy the office space. Schooner is the lessee of the corporate offices and is solely responsible for the obligations under the lease.

## VI.      EVENTS LEADING TO THE CHAPTER 11 CASES

**A.      General Background**

Currently, the Debtors derive the totality of their revenue from the sale of crude oil, natural gas, and natural gas liquids. Despite the "fresh start" afforded to the Debtors at the conclusion of their 2017 Chapter 11 Cases, the Debtors began to experience significant revenue, cash flow, and liquidity challenges, due in large part to the decrease in market price for crude oil and natural gas. The drop in market price was a result of OPEC's market manipulation in the early part of 2020 and the Covid-19 pandemic which drove the demand down for crude oil and natural gas. As a result of the drop in demand and collapsing oil prices, the Debtors' revenue streams began to fall. Declining revenues have made it increasingly difficult for the Debtors to continue to service their debt obligations. Additionally, because of the sustained decline in commodity prices in 2019 and 2020 along with the Debtors' negatively affected cash flows, the Debtors were unable to raise any additionally operating capital in the form of debt or equity.

To address the declining working capital of the Debtors, the Debtors explored strategic alternatives, including a financial restructuring, sale of assets, or both. In July 2019, the Debtors engaged Intrepid Partners, LLC ("Intrepid"), a recognized financial advisory firm, to evaluate potential out of court restructuring alternatives, including a combination with an entity that had joint interests in many of the same properties owned by the Debtors, but the potential counterparty in the transaction ultimately elected not to pursue such combination. Ultimately, the Debtors sold a portion of their assets to Talos Energy, Inc. ("Talos") for a combination of cash and stock (described in detail below). The Debtors also endeavored to sell the Debtors' remaining assets but were unsuccessful.

On February 17, 2021, the Agent sent a notice of the initiation regarding the Prepetition Credit Agreement of a private foreclosure process with regard to the Talos Stock (defined below) with such sale to take place on or after February 27, 2021. This was a precipitating factor in the immediate filing of these Chapter 11 Cases.

**B.**     **Current State of the Oil & Gas Industry and Impact on Debtors**

The upstream oil and gas business is cyclical and commodity prices have remained volatile for an extended period. The decline of commodity prices that began in mid-2014 was exacerbated in 2020 due to a number of factors, including but not limited to: (a) weakened demand for oil, natural gas and NGLs in response to the worldwide COVID-19 outbreak; (b) a failure by the Organization of the Petroleum Exporting Countries ("OPEC") and a group of other oil producing nations led by Russia to agree on oil production cuts in response to the COVID-19 outbreak; (c) Saudi Arabia's announcement, following the events referenced in clause (b), that it would increase production and cut oil prices via a strong supply increase; and (d) volatility in oil price markets due to oversupply, lack of available storage capacity, and calls by investors for E&P companies to reduce current year development capital spending.

In response to the decrease in demand and condition of relative oversupply in response to the COVID-19 outbreak, West Texas Intermediate ("WTI") prices at times in 2020 went negative, obligating producers to pay buyers to take crude oil at month end settlement. WTI prices have remained heavily volatile during 2020. The depressed pricing environment has continued for longer than expected and has affected the Debtors just as it has affected the industry as a whole. The Debtors' average realized prices for the first half of 2020 have decreased 44% for crude oil, 31% for natural gas and 47% for NGLs, in each case, as compared with 2019 realized prices. These low prices resulted in significant negative impacts on revenues, profitability, cash flows and

proved reserves, and ultimately led to asset impairments and a reduction in the Debtors' capital spending program.

Because of the significant decline in crude oil and natural gas the Debtors began to face significant liquidity concerns and were unable to comply with certain covenants required under their debt agreements. This liquidity concern along with the specific events detailed in this section led to uncertainty of whether the Debtors could continue as a going concern.

## C.   Initial Efforts to Restructure Out of Court and the Talos Sale

As stated above, in July 2019, the Debtors engaged Intrepid to assist the Debtors in evaluating strategic out of court restructuring alternatives. Initially, Intrepid identified a potential transaction with an entity that had joint had joint interests in many of the same properties owned by the Debtors, but the potential counterparty in the transaction ultimately elected not to pursue such transaction.

In December 2019, Intrepid was retained to market the assets of the Debtors and evaluate potential counterparties for an acquisition of those assets. After extensive marketing efforts by the Debtors and Intrepid, on May 8, 2020, Castex entered into a letter of intent with Talos. Talos was a primary target for the sale as the prior management team of the Debtors and other Castex affiliates previously sold other Castex affiliates to Talos.

Pursuant to the definitive agreement executed on June 19, 2020, Talos agreed to acquire certain of the Debtors' offshore assets for a total consideration of $65 million to be comprised of $6.5 million in cash and $58.5 million in newly-issued Talos stock (equating to a mix of 90% stock and 10% cash) (the "Talos Sale"). The Debtors received 4,602,460 shares of stock in Talos Energy, Inc. at a price of $11.81/share ("Talos Stock").[4] The Talos Sale closed in August 2020.

## D.   Attempted Sale of Remaining Company and Assets

Following the Talos Sale, the Talos Sale, the Debtors' primary assets consisted of the Apache Judgment (defined below), the Talos Stock, and miscellaneous operated and non-operated onshore Louisiana and Gulf of Mexico producing and nonproducing oil and gas assets. In the time between the Talos Sale and the Petition Date, the Debtors engaged Intrepid to explore numerous potential options for either restructuring its business around its remaining assets or selling its remaining oil and gas assets. Among the counterparties considered for such a transaction were the Debtors' contract operator, CEI (defined below), parties with similar assets, and other working interest owners in properties in which the Debtors own an interest. Those efforts ultimately did not bear fruit due to, among other reasons, issues related to the Debtors' unresolved P&A Obligations. Ultimately, in the Debtors' view, the P&A Obligations became a material hindrance in the Debtors' efforts to find an out of court solution.

## E.   Surety Bond Litigation

In May 2020, around the time the Debtors were negotiating the agreement with Talos, Castex received an initial bonding collateral request from U.S. Specialty Insurance Company (the

---

[4] The Talos Stock is currently held in physically certificated form and is held by the Prepetition Agent.

"Surety") demanding that additional collateral be posted to secure the Debtors' surety bonds which in turn secure some of its asset retirement obligations.

The pressure to post additional collateral continued to intensify following the Talos Sale. On December 9, 2020, Surety filed suit in Texas state court, seeking, among other things, a temporary restraining order, temporary injunction, and a permanent injunction to compel the Debtors to provide collateral of $11,864,000.00 in a form acceptable to the Surety to secure the face amount of the undischarged liability of the Surety under certain bonds. See Cause No. 2020-78940; *U.S. Specialty Insurance Company v. Castex Offshore LLC n/k/a Castex Offshore, Inc., et al.*; In the 269th Judicial District Court of Harris County, Texas.

At a hearing in December 2020, the presiding Texas State District Judge denied the Surety's request for a temporary restraining order.

## F.   Change of Operators and Management

Following the Court's entry of the 2018 Confirmation Order and the formation of Castex, the Debtors entered into that certain Second Amended and Restated Shared Services Agreement dated March 18, 2018 with Castex Energy, Inc. ("CEI"),[5] as further amended, modified, and supplemented (the "CEI SSA"). Pursuant to the CEI SSA, CEI operated all of the Debtors' oil and gas assets for which the Debtors are the designated operator, was responsible for all of its management and back office operations, and provided all of the Debtors' officers, including John Stoika, who held the title of President and was a member of Castex's Board of Directors (the "Board").

Further, in the Fall of 2020, CEI, the Debtors, and the Prepetition were engaged in negotiations with respect to the transfer of the Debtors' remaining oil and gas assets to CEI, including an assumption by CEI of the P&A Obligations, in exchange for certain consideration to CEI. During this period, the Debtors also sought to retain Douglas J. Brickley as chief restructuring officer (the "CRO"), in the event that no transfer to CEI was ultimately achieved. Shortly after negotiations with CEI failed, on November 20, 2020, John Stoika resigned as President and Director of Castex and COI; Ashley Green, Jonathan Wilson, and Aaron Killian also resigned as Officers of Castex and its subsidiaries; and CEI announced its intent to terminate the CEI SSA effective as of November 25, 2020. In a separate letter, CEI advised the Debtors it also intended to cancel the Debtors' insurance policies entered into by CEI on behalf of the Debtors. The Debtors believe they may hold claims or causes of action against CEI resulting from these and other events. The Debtors' claims may include a turnover action pursuant to section 542 of the Bankruptcy Code to recover the return premiums on the cancelled insurance policies and other Debtor funds collected by CEI. Any and all claims that the Debtors' may have against CEI resulting from CEI's relationship with the Debtors, including, but not limited to, claims arising from or related to the CEI SSA, are expressly reserved in the Plan for the benefit the Debtors' creditors.

As a result of the withdrawal of CEI as operator of the Debtors' oil and gas assets for which the Debtors are the operator of record as well as the resignation of CEI's employees as officers

---

[5] CEI, the Debtors' largest unsecured creditor (disputed), is an entity that was previously affiliated with the Castex entities during the 2017 Chapter 11 Cases but is no longer an affiliate of the Debtors.

and management of the Debtors, the Board sought a replacement operator and new management. On approximately November 25, 2020, the CRO replaced prior CEI management. Since the CRO's retention the CRO has been directing the Debtors' efforts to restructure or sell its remaining assets. Presently, the CRO reports to the Castex Board of Directors and the Special Committee. The remaining Castex Board of Directors are David Alexander, Daniel Gillett, Gregory L. Miller and Richard Sherrill. The Special Committee is comprised of Mr. Gillett and Mr. Sherrill.

As set forth above, presently, Schooner is the now acting operator of the Debtors' oil and gas assets. Schooner is operating under the Schooner Agreement on terms that are substantially more favorable to the Debtors than were afforded under the CEI SSA. Indeed, the Schooner Management Fee is less than one half of the fee that the Debtors previously paid to CEI under the CEI SSA. The Debtors' have built a strong working relationship with Schooner that will provide substantial benefits to the Debtors in these Chapter 11 Cases and help maintain the value of the estates for the benefit of all creditors.

### G. The Apache Judgment

As of the Petition Date, among the Debtors' most valuable assets is the interest that certain of the Debtors have in a judgment (the "Apache Judgment") obtained against Apache in the case *Apache Corporation v. Castex Offshore, Inc., et al.*, Cause No. 2015-48580, in the 133rd District Court of Harris County, Texas (the "State Court").

Specifically, On May 6, 2019, after a trial in the State Court, the jury found in favor of CEP and COI. The State Court entered a judgment against Apache for approximately $69.5 million plus costs and post-judgment interest as a result of what the jury determined to be willful misconduct by Apache in its oil and gas operations and breach of contract. The Prepetition Lenders have a lien and security interest in the Apache Judgment.

Apache is appealing the Apache Judgment, which appeal is currently pending in the Fourteenth Court of Appeals under Cause No. 14-19-00605-CV. On October 27, 2020, the court of appeals held oral arguments relating to such appeal.

### H. Plan Term Sheet

As the filing of these Chapter 11 Cases became imminent, prior to the filing of these Chapter 11 Cases, the Prepetition Lenders through the Agent and the Debtors negotiated a Chapter 11 Plan Term Sheet (the "Plan Term Sheet"). The Terms of the Plan Term Sheet have been incorporated in the Plan and represent the best way forward for all creditor constituencies.

### I. Summary

The Debtors filed these Chapter 11 Cases in order to provide a method of satisfying the Secured Debt Claims, providing a recovery to their creditors, and specifically addressing the P&A Obligations, other than the Excluded P&A Obligations. The Plan represents the Debtors' best chance to provide a recovery to the Prepetition Lenders, other creditors, and the P&A Obligations associated with the Debtors' assets.

## VII.   SIGNIFICANT EVENTS IN THE CHAPTER 11 CASES

### A.   Introduction

On the Petition Date – February 26, 2021 – the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division.  Castex was assigned case number 21-30710, Castex Energy was assigned case number 21-30711, CEP was assigned case number 21-30712, and COI was assigned case number 21-30713.  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered under Castex's case number 21-30710 pursuant to Bankruptcy Rule 1015(b).  The Debtors remain in possession of their property and continue to manage their assets as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  A brief summary of significant matters or events that have occurred to date in the Chapter 11 Cases is set forth below.  The description of such matters or events is qualified in its entirety by the actual pleadings Filed in the Chapter 11 Cases and, to the extent of any inconsistencies between the descriptions in this Disclosure Statement and such pleadings, such pleadings shall control.  All of such pleadings are on File with, and may be obtained from, the Bankruptcy Court.

### B.   Cash Collateral

On February 28, 2021, the Debtors Filed their *Emergency Motion for Entry of Orders (i) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (ii) Granting Adequate Protection to the Prepetition Secured Parties, (iii) Granting Liens and Superpriority Claims, (iv) Modifying the Automatic Stay, and (v) Scheduling a Final Hearing* (the "Cash Collateral Motion"), which requested authority to use the Prepetition Lenders' "cash collateral" as that term is defined by 11 U.S.C. § 363.  On March 2, 2021, the Bankruptcy Court held a hearing on the Cash Collateral.  On March 2, 2021, the Bankruptcy Court entered an *Interim Order (I) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (ii) Granting Adequate Protection to the Prepetition Secured Parties, (iii) Granting Liens and Superpriority Claims, (iv) Modifying the Automatic Stay, and (v) Scheduling a Final Hearing* (the "Interim Cash Collateral Order").   The Interim Cash Collateral Order provides, among other things, adequate protecting liens to the extent there is a diminution in value of the interests of the Prepetition Lenders in the prepetition collateral, super-priority administrative expense claims under Section 507(b) of the Bankruptcy Code, and payment of the Prepetition Lenders' fees, costs, expenses, and charges in favor of the Prepetition Lenders.

### C.   Schedules and Statements of Financial Affairs

On February 28, 2021, the Debtors filed their *Emergency Motion for Entry of an Order Extending Time to File (I) Schedules of Assets and Liabilities, (II) Schedules of Current Income and Expenditures, (III) Schedules of Executory Contracts and Unexpired Leases, and (IV) Statements of Financial Affairs* (the "Schedule Extension Motion").  The Bankruptcy Court granted the Schedule Extension Motion and the Debtors' schedules and statements of financial affairs are due on March 22, 2021.

16

**D.**      **Retention and Compensation of Professionals by the Debtors**

Prior to the Petition Date, Okin Adams LLP was retained as general bankruptcy counsel to the Debtors.  The Debtors will be filing their application to employ Okin Adams LLP as general bankruptcy counsel.

The Debtors retained Douglas J. Brickley as Chief Restructuring Officer and The Claro Group, LLC to provide certain financial and restructuring-related services.  The CRO will be filing his application to employ himself and The Claro Group, LLC.

The Debtors have also retained Thompson Knight, LLP as corporate counsel.  The Debtors will be filing their application to employ Thompson Knight, LLP as special counsel under 11 U.S.C. § 327(e).

**E.**      **Section 341 Meeting of Creditors**

The meeting of creditors pursuant to section 341 of the Bankruptcy Code has been set for April 1, 2021.

**F.**      **Bar Dates**

On February 28, 2021, the Debtors filed their *Emergency Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* (the "Bar Date Motion").  The Bankruptcy Court granted the Bar Date Motion and, among other things, set the Proofs of Claim bar date, except for Governmental Units, for April 21, 2021, at 5:00 p.m. (Prevailing Central Time).  The Bankruptcy Court set the Proofs of Claim bar date for Governmental Units for August 25, 2021, at 5:00 p.m. (Prevailing Central Time).

On March __, 2021, the Debtors' claims and noticing agent, Donlin, Recano & Company, Inc., served a copy of the *Notice of Chapter 11 Bankruptcy Case* to the Debtors' creditors.  Among other things, this notice established April 21, 2021, at 5:00 p.m. (Prevailing Central Time), as the deadline for filing Claims against the Debtors by all creditors (not including Governmental Units), August 25, 2021, at 5:00 p.m. (Prevailing Central Time)as the deadline for Filing Claims against the Debtors by all Governmental Units.

The Bankruptcy Court has not yet established a bar date for the Filing of Administrative Expense Claims in the Chapter 11 Cases, but it is expected that such bar date will be set forth in order approving this Disclosure Statement or the Confirmation Order.

**VIII.   SUMMARY OF THE PLAN**

**A.**      **Introduction**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under Chapter 11, a debtor is authorized to reorganize and/or liquidate its business for the benefit of itself and its creditors and stockholders.  The formulation of a plan is the principal objective of a Chapter

11 bankruptcy case.  In general, a Chapter 11 plan: (i) divides claims and equity interests into separate classes; (ii) specifies the property each class is to receive under such plan; and (iii) contains other provisions necessary to the reorganization and/or liquidation of the debtor.  Chapter 11 does not require each holder of a claim or equity interest to vote in favor of the plan in order for the bankruptcy court to confirm the plan.  A plan must be accepted, however, by the holders of at least one impaired class of claims (unless there are no impaired classes) without considering the votes of "insiders" (within the meaning of section 101(31) of the Bankruptcy Code) in that impaired class.

The summary of the Plan contained herein addresses only certain provisions of the Plan.  As a summary, it is qualified in its entirety by reference to the Plan itself (including the Plan Supplement and Exhibits which are referred to therein).  The Plan (including the Plan Supplement and Exhibits) shall control and, upon Confirmation and the Effective Date, bind the Debtors, the Post-Effective Date Debtors, the Liquidating Trust, and all Holders of Claims and Interests and other parties in interest except as expressly set forth in the Plan.  TO THE EXTENT THAT THE TERMS OF THIS DISCLOSURE STATEMENT VARY OR CONFLICT WITH THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL CONTROL.

## B.    General Overview of the Plan

The Debtors have filed the Plan with the Bankruptcy Court.  As more fully set forth in the Plan, the Plan provides for distributions to Holders of Allowed Claims from, among other things: (i) transferring the Apache Claims, the Secured Cash Amount, and the Talos Shares in full and final satisfaction of such Allowed Secured Debt Claim, and (ii) creating the Liquidating Trust in which holders of Allowed General Unsecured Claims shall receive their Pro Rata Share interests in the Liquidating Trust.

The Plan shall be implemented on the Effective Date.  At the present time, the Debtors believe that there will be sufficient funds, as of the Effective Date, to pay in full the expected payments required under the Plan to Holders of Allowed Administrative Expense Claims, Holders of Allowed Priority Non-Tax Claims in Class 1, and Holders of Other Priority Claims in Class 2.  Class 3, Holders of Allowed Secured Debt Claims, will receive their Pro Rata Share of the equity interests in Lender NewCo.  Class 4, Holders of General Unsecured Claims, will receive a Pro Rata Share of the interests in the Liquidating Trust.  Class 5, Intercompany Claims, will be adjusted or reinstated, as determined by the Debtors, subject to the consent of the Required Lenders.  Class 6, Class 510(b) Claims, shall have the Section 510(b) Claims extinguished and cancelled receiving no distribution.  Class 7, Intercompany Interests, will be adjusted, reinstated or discharged by the Debtors.  Class 8, Existing Interests, will be cancelled, released, and extinguished by the Debtors.

As more fully set forth herein, and as described in the Plan, the Liquidation Trust Agreement, and other Plan Documents, the Plan calls for the creation of the Liquidating Trust to prosecute those certain Retained Cases of Actions and the other Liquidation Trust Assets for the benefit of creditors holding Allowed Claims in Class 4.  The Debtors have preliminarily analyzed the proposed Liquidation Trust Assets and the Debtors believe that the liquidation of the Liquidation Trust Assets will generate enough funds to provide a distribution to Class 4.

### C.     Classification of Claims and Equity Interests

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and interests of a debtor's equity holders.  The Plan divides the Claims and Equity Interests into eight (8) Classes. 11 U.S.C. § 1123(a)(1).

Section 101(5) of the Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured," or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured."  11 U.S.C. § 101(5).  The Debtors are required, under section 1122 of the Bankruptcy Code, to classify the Claims and Equity Interests into separate Classes which contain Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests within such Class.  11 U.S.C. § 1122(a).

The Debtors believe that they have classified all Claims and Equity Interests in compliance with the provisions of section 1122 of the Bankruptcy Code.  It is possible, however, that a Holder of a Claim or another interested party may challenge the classification of Claims and Equity Interests contained in the Plan and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In such event, it is the present intent of the Debtors, to the extent permitted by the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to provide for whatever classification might be required by the Bankruptcy Court for Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the Class or Classes of which the accepting Holder is ultimately deemed to be a member.  Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.  A reclassification of Claims after approval of the Disclosure Statement might necessitate a re-solicitation of acceptances or rejections of the Plan.

### IX.     ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

### A.     Administrative Claims and Priority Claims

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims, Professional Compensation Claims, and Priority Tax Claims are not classified for purposes of voting on, or receiving distributions under, the Plan, and the treatment of the Claims is set forth herein.  Holders of Allowed Administrative Expense Claims are not entitled to vote on the Plan.

The Holders of Allowed Administrative Expense Claims are entitled to be paid in full under a plan of reorganization pursuant to the Bankruptcy Code.  The Debtors believe that the Administrative Expense Claims will consist primarily of post-petition operating expenses incurred by the Debtors, fees and costs of Professionals, fees required to be paid to the United States Trustee, the costs of solicitation of votes on the Plan (including photocopying and postage charges), and any Administrative Expense Claims Filed with the Bankruptcy Court by the Administrative Claim Bar Date, in each of the foregoing cases as Allowed by a Final Order of the Bankruptcy Court or as otherwise provided in the Plan.

1.     *Administrative Claims*. Except as otherwise provided in the Bar Date Order, and unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Post-Effective Date Debtors, each Holder of an Allowed Administrative Claim (other than Holders of Professional Compensation Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (i) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter; or (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than ten (10) business days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter.

Except for Professional Compensation Claims, and unless previously filed, requests for payment of Administrative Claims must be filed and served on the Post-Effective Date Debtors no later than the Administrative Claim Bar Date. Objections to such requests must be filed and served on the Post-Effective Date Debtors and the requesting party by the later of (i) thirty (30) days after the Effective Date, or (ii) thirty (30) days after the filing of the applicable request for payment of the Administrative Claims, if applicable pursuant to the Bar Date Order. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with a Final Order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to file and serve a request for such payment of such Administrative Claims that do not file and serve such request by the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Post-Effective Date Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Post-Effective Date Debtors or any action by the Bankruptcy Court.

## B.    **Professional Compensation Claims**

1.     *Final Fee Applications*. All requests for payment of Professional Compensation Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be filed no later than the Professional Compensation Claim Bar Date. Objections to Professional Compensation Claims must be filed and served on the Post-Effective Date Debtors and the Professional to whose application the objections are addressed no later than the Professional Compensation Claim Objection Deadline. The Bankruptcy Court shall determine the Allowed amounts of such Professional Compensation Claims after notice and hearing in accordance with the procedures established by the Bankruptcy Court, including those certain compensation procedures set forth and defined in the Bankruptcy Court's *Order Establishing Procedures for the Interim Compensation and Reimbursement of Expenses of Professionals* [ECF # ●]. Allowed Professional Compensation Claims shall be paid by the Post-Effective Date Debtors in Cash within ten (10) business days of the entry of a Final Order allowing such Claims.

2.     *Professional Fee Escrow Amount*. All Professionals shall estimate in good faith their unpaid Professional Compensation Claims before and as of the Effective Date and shall

deliver such estimate to the Debtors at least three (3) calendar days before the Effective Date; *provided*, *however*, that such estimate shall not limit or be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Compensation Claims.  If a Professional does not provide such estimate, the Debtors and Post-Effective Date Debtors may estimate the unbilled fees and expenses of such Professional; *provided*, *however*, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses incurred by, or payable to, such Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Escrow Amount.

3.      *Professional Fee Escrow*.  If the Professional Fee Escrow Amount is greater than zero, then as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors will establish and fund the Professional Fee Escrow with Cash equal to the Professional Fee Escrow Amount and no Liens, Claims, or interests will encumber the Professional Fee Escrow in any way.  The Professional Fee Escrow (including funds held in the Professional Fee Escrow) will (i) not be and will not be deemed to be property of the Debtors or the Post-Effective Date Debtors and (ii) will be held in trust for the Professionals; *provided*, *however*, that funds remaining in the Professional Fee Escrow after all Allowed Professional Compensation Claims have been irrevocably paid in full will revert to Lender NewCo.  Allowed Professional Compensation Claims will be paid in Cash to such Professionals from funds held in the Professional Fee Escrow as soon as reasonably practicable after such Claims are Allowed by an order of the Bankruptcy Court; *provided*, *however*, that the Debtors' obligations with respect to Professional Compensation Claims will not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

## C.      **Payment of Fees and Expenses Under Cash Collateral Order**

On the later of (a) the Effective Date and (b) the date on which such fees, expenses, or disbursements would be required to be paid under the terms of the Cash Collateral Order, the Debtors or the Post-Effective Date Debtors (as applicable) shall pay all fees, expenses, and disbursements of the Prepetition Agent and Prepetition Lenders, in each case that have accrued and are unpaid as of the Effective Date and are required to be paid under or pursuant to the Cash Collateral Order.

## D.      **Priority Tax Claims**

Except (a) to the extent that the Holders of Allowed Priority Tax Claims have already been paid, satisfied or otherwise released prior to the Effective Date, and (b) to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, then in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Priority Tax Claim, each Holder of Allowed Priority Tax Claim shall receive from the applicable Post-Effective Date Debtors on the later of: (i) the Effective Date; (ii) the date such Priority Tax Claim becomes an Allowed Claim; (iii) the date on which such Allowed Priority Tax Claim first becomes due and payable; or (iv) as soon thereafter as is reasonably practicable, an amount in Cash equal to the unpaid amount of such Allowed Priority Tax Claim; *provided*, *however*, that the Post-Effective Date Debtors shall have the right to pay any Allowed Priority Tax Claim, or the remaining balance of such Claim, in full in Cash at any time on or after the Effective Date, without premium or penalty.

**E.      U.S. Trustee Quarterly Fees**

Following the Effective Date, any fees required to be paid to the United States Trustee, pursuant to 28 U.S.C. §1930(a)(6) shall be paid by the Post-Effective Date Debtors, until the earlier of (i) the closing of the Chapter 11 Cases by the issuance of a final decree by the Bankruptcy Court, or (ii) the entry of a Final Order by the Bankruptcy Court dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to another chapter under the Bankruptcy Code.  Any such payment to the United States Trustee shall be in the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) based upon the applicable disbursements for the relevant period and shall be made within the time period set forth in 28 U.S.C. §1930(a)(6).

## X.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**A.      Classification in General**

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving Plan Distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied.

**B.      Formation of Debtor Groups for Convenience Only**

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, Confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities.

**C.      Summary of Classification of Claims and Interests**

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (a) Impaired and Unimpaired under the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.  The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| Class 2 | Priority Non-Tax Claims | Unimpaired | No (Presumed to Accept) |
| Class 3 | Secured Debt Claims | Impaired | Yes |
| Class 4 | General Unsecured Claims | Impaired | Yes |
| Class 5 | Intercompany Claims | Impaired | No (Deemed to Reject) |
| Class 6 | Section 510(b) Claims | Impaired | No (Deemed to Reject) |
| Class 7 | Intercompany Interests | Unimpaired | No (Presumed to Accept) |
| Class 8 | Existing Interests | Impaired | No (Deemed to Reject) |

### D.   Treatment of Claims and Interests

Set forth below is a summary of each Class of Claims and Equity Interests and the expected distributions under the Plan to Holders of Allowed Claims against and Allowed Equity Interests in the Debtors. The Debtors' do not assert a potential recovery to Class 4 Claimants. Except as otherwise specifically provided in Article III of the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests.

1.   *Class 1: Other Secured Claims.*

**Description.** Class 1 consists of Claims of Other Secured Claims

**Treatment.** Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Post-Effective Date Debtors, and with the reasonable consent of the Required Lenders, such Holder will (i) retain its security interest and relative priority in the applicable assets of the Post-Effective Date Debtors or (ii) receive such other treatment so as to render such Holder's Allowed Other Secured Claim Unimpaired.

**Voting.** Class 1 Claims are Unimpaired under the Plan. In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Allowed Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to such Allowed Other Secured Claims.

2.   *Class 2: Priority Non-Tax Claims*.

**Description.** Class 2 consists of Claims asserted under Bankruptcy Code sections 507(a)(3-7 and 9-10).

**Treatment.** Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim shall be entitled to receive, on or after the Effective Date, in full and final satisfaction, compromise,

settlement, release, and discharge of and in exchange for each Priority Non-Tax Claim, (i) payment in full in Cash of its Allowed Class 2 Claim; or (ii) such other treatment as is consistent with the requirements of Bankruptcy Code section 1129(a)(9), payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, in each case, or as soon as reasonably practicable thereafter.

**Voting.** Class 2 Claims are Unimpaired under the Plan. In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Allowed Priority Non-Tax Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to such Allowed Priority Non-Tax Claims.

3.  *Class 3: Secured Debt Claims*.

**Description.**  Class 3 consists of the Prepetition Lenders' secured Claim against the Debtors.

**Treatment.**  On the Effective Date, or as soon thereafter as reasonably practicable, each Holder of an Allowed Secured Debt Claim will receive, in full and final satisfaction of such Allowed Secured Debt Claim, its Pro Rata Share of the equity interests in Lender NewCo.  On the Effective Date, or as soon thereafter as reasonably practicable (and, in the case of the Excess Escrowed Talos Shares, as soon as reasonably practicable following receipt by the Post-Effective Date Debtors), the Debtors shall transfer to Lender NewCo the following Assets or the proceeds related thereto, which such Assets will vest free and clear of any Liens, Claims or encumbrances:

       i.   the Apache Claims;

      ii.   the Secured Cash Amount; and

     iii.   the Talos Shares.

**Voting.**  Class 3 Claims are Impaired under the Plan.  Holders of Allowed Claims in Class 3 are entitled to vote regarding acceptance thereof.

4.  *Class 4: General Unsecured Claims*.

**Description.**  Class 4 consists of General Unsecured Claims.

**Treatment.**  On the Effective Date, or as soon thereafter as reasonably practicable, each Holder of an Allowed General Unsecured Claims will receive, in full and final satisfaction of such Allowed General Unsecured Claim, a Pro Rata Share of interests in the Liquidating Trust; provided, that solely in the event Class 4 votes to accept the Plan, then the Pro Rata Share of the Liquidating Trust interests allocable to the Deficiency Claims shall not be distributed to the Prepetition Lenders but shall instead be re-allocated to all Holders of Allowed General Unsecured Claims other than the Prepetition Lenders.

**Voting.**  Class 4 Claims are Impaired under the Plan.  Holders of Allowed Class 4 Claims are entitled to vote regarding acceptance thereof.

5.    *Class 5: Intercompany Claims*.

**Description.** Class 5 consists of Intercompany Claims

**Treatment**.  On the Effective Date, all Intercompany Claims will be adjusted or reinstated, as determined by the Debtors, subject to the consent of the Required Lenders.

**Voting**.  Class 5 Claims are Impaired under the Plan.  In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Intercompany Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to such Allowed Intercompany Claims.

6.    *Class 6: Section 510(b) Claims*.

**Description.**  Class 6 shall consist of Allowed Section 510(b) Claims of all of the Section 510(b) Claimants.

**Treatment.**  On the Effective Date, all of the Debtors' outstanding obligations under the Section 510(b) Claims shall be extinguished and canceled, and each Holder of a Section 510(b) Claim shall receive no Plan Distribution on account of such Claim.

**Voting.**  Class 6 Claims are Impaired under the Plan. In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Section 510(b) Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to such Allowed Section 510(b) Claims.

7.    *Class 7: Intercompany Interests*.

**Description.**  Class 7 shall consist of Allowed Intercompany Interests.

**Treatment.**  On the Effective Date, all Allowed Intercompany Interests will be adjusted, reinstated, or discharged as determined by the Debtors, subject to the consent of the Required Lenders.

**Voting.**  Class 7 Interests are Unimpaired under the Plan.  In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Allowed Intercompany Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to such Allowed Intercompany Interests.

8.    *Class 8: Existing Interests*.

**Description.**  Class 8 shall consist of all Existing Interests.

**Treatment.**  On the Effective Date, Existing Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise, and each Holder of an Existing Interest will receive no recovery.

**Voting.** Class 8 Interests are Impaired under the Plan.  In accordance with section 1126(g) of the Bankruptcy Code, the Holders of Allowed Existing Interests are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such Holders shall not be solicited with respect to such Allowed Existing Interests.

**E.**     **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights with respect to any Unimpaired Claims, including, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**F.**     **Separate Classification of Other Secured Claims**

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of receiving Plan Distributions.

**G.**     **Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interests temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan.

**H.**     **Voting Classes; Presumed Acceptance by Non-Voting Classes**

Classes 3 and 4 are Impaired and are entitled to vote regarding acceptance or rejection of the Plan; *provided*, *however*, if a Class contained Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

**I.**     **Controversy Concerning Impairment**

If any controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and hearing, determine such controversy concerning Impairment.  Failure to timely file an objection in the Chapter 11 Cases shall result in such Person or Entity waiving any objection to the Impairment classifications set forth in the Plan.

**J.**     **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Liquidating Trustee reserves the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable

26

subordination relating thereto.

## K.     Statutory P&A Claims

The Debtors' efforts to satisfy the Statutory P&A Claims related to the Operated Properties may not be completed prior to and shall continue following the Effective Date.  To the extent that the Statutory P&A Claims related to an Operated Property are completed in accordance with applicable law or regulation, the Regulatory Agencies' Claim for P&A Obligations related to such Operated Property shall be fixed at $0.00 and shall be deemed fully satisfied and discharged.

If the Debtors, the Liquidating Trustee, or other non-Debtor third party, as applicable, are unable to satisfy any such Statutory P&A Claims, following the Effective Date with regard to a particular Operated Property, then the Debtors or the Liquidating Trustee, as applicable, shall inform the applicable Regulatory Agencies of the same, and the Regulatory Agencies and the Debtors or the Liquidating Trustee, as applicable, shall work together in good faith to create or obtain a written estimate of the costs necessary to satisfy the Debtors' remaining P&A Obligations as to the applicable Statutory P&A Claim.  Upon agreement over such written estimate, the Regulatory Agencies' Claim for P&A Obligations on the applicable lease or right of way shall immediately be fixed at such amount and shall constitute an Allowed Statutory P&A Claim.  To the extent that the Debtors or the Liquidating Trustee and the applicable Regulatory Agencies are unable to agree upon an estimate of the costs necessary to satisfy such Statutory P&A Claim, then such dispute shall be submitted to the Bankruptcy Court, which shall, after notice and an evidentiary hearing, set the Regulatory Agencies' Allowed Statutory P&A Claim.  For the avoidance of doubt, Statutory P&A Claims shall not be assignable or payable, under any theory, including subrogation, to any party other than a Regulatory Agency.

## L.     2017 Chapter 11 Unsecured Creditor Claims

Nothing in this Chapter 11 Plan shall impair or otherwise modify the rights of the 2017 Chapter 11 Unsecured Creditors to receive distributions from the 2017 Chapter 11 Unsecured Creditor Reserve.  Distributions from the 2017 Chapter 11 Unsecured Creditor Reserve shall be made by the Liquidating Trustee in accordance with the 2017 Chapter 11 Plan and Article IV section D, paragraph 4 of the Plan.

## M.     Cramdown

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (a) seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## N.     No Waiver

Nothing contained in the Plan shall be construed to waive the Debtors' or other Person's right to object on any basis to any Claim or Interest.

## XI.   MEANS FOR IMPLEMENTATION OF THE PLAN

**A.    Vesting of Assets in the Liquidating Trust**

On the Effective Date, the Castex Liquidating Trust shall be deemed duly formed and the Debtors shall be deemed to have irrevocably transferred and assigned (in accordance with any applicable tax laws) to the Liquidating Trust, the Liquidating Trust Assets, to hold in trust for the Liquidating Trust Beneficiaries pursuant to the terms of the Plan and the Liquidating Trust Agreement.  Except as otherwise provided by the Plan, upon the Effective Date, title to the Liquidating Trust Assets shall pass to the Liquidating Trust free and clear of all Claims and Interests, in accordance with section 1141 of Bankruptcy Code.

**B.    Discharge of the CRO**

On the Effective Date, the Debtors' Chief Restructuring Officer shall be discharged and released from any further obligation or duty to the Debtors.

**C.    The Post-Effective Date Debtors**

1.    *Single Share*.  On the Effective Date, the Single Share of the Post-Effective Date Holdco shall be issued to the Liquidating Trustee to hold in trust for the benefit of the Liquidating Trust Beneficiaries and the Single Share shall be recorded on the books and records maintained by the Liquidating Trustee.

2.    *Continued Corporate Existence*.  Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as the Post-Effective Date Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized, including in accordance with the Amended Organizational Documents, as applicable. After the Effective Date, pursuant to the Plan, the Liquidating Trustee shall have the sole authority to manage the operations of the Post-Effective Date Debtors without any further approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Post-Effective Date Debtors shall operate solely to the extent required to liquidate the Debtors' oil and gas interests, which shall, for the avoidance of doubt, include operations related to the plugging and abandonment, and decommissioning of the Debtors' oil and gas interests (other than those for which title is relinquished, abandoned, and/or otherwise transferred to a non-Debtor).  For the avoidance of doubt, the Post-Effective Date Debtors shall not operate any of the Abandoned Assets following the Effective Date.

3.    *Winddown of the Debtors*.  At such time as the P&A Plan is completed or the Debtors' interest in all property in the P&A Plan is relinquished, abandoned, and/or otherwise transferred to a non-Debtor, the Debtors shall be deemed dissolved.  The Liquidation Trustee shall have all power to wind up the affairs of the Debtors under applicable state laws in addition to all the rights, powers, and responsibilities conferred by the Bankruptcy Code, the Plan, the Liquidation Trust Agreement, and may, but shall not be required to dissolve the Debtors under applicable state law.

4.    *Corporate Action*.  Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects.  All matters provided for in the Plan

involving the corporate or limited liability company structure of the Debtors or the Post-Effective Date Debtors, and any corporate or limited liability company action required by the Debtors or the Post-Effective Date Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors.

On or before (as applicable) the Effective Date, the appropriate directors, officers, and managers of the Debtors or the Liquidating Trustee, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan).  The authorizations and approvals contemplated herein shall be effective notwithstanding any requirements under nonbankruptcy law.

5.     *Intercompany Interests; Corporate Reorganization*.  To the extent reinstated under the Plan, on the Effective Date, the Intercompany Interests shall be reinstated for the ultimate benefit of the Holders of Claims and Interests as set forth in the Plan without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or stockholders of any Debtor or Post-Effective Date Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

## D.     **The Liquidating Trust**

The following provisions of this section are intended to summarize the material terms of the Liquidating Trust Agreement which will be filed as a Plan Supplement and be attached as Exhibit B to the Plan, which shall control the formation, operations and dissolution of the Liquidating Trust.  In the event of any conflict between the terms of this section and the terms of the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement shall govern.

1.     Formation of the Liquidating Trust. On or before the Effective Date, the Liquidating Trust Agreement shall be executed by the Debtors and the Liquidating Trustee, and all other necessary steps shall be taken to establish the Liquidating Trust.  For the avoidance of doubt, entry of the Confirmation Order shall constitute a finding that the Liquidating Trust exists and is a valid Entity for purposes of all non-bankruptcy law.

2.     Purpose of Liquidating Trust. The Liquidating Trust shall be established only for the purposes of liquidating the Liquidating Trust Assets, including, but not limited to prosecuting and resolving objections to Disputed Claims against the Debtors, and liquidating and distributing its Assets, with no objective to continue or engage in the pursuit of a trade or business; *provided, however*, that the Liquidating Trustee shall be authorized to manage the operation of the Debtors' oil and gas properties to the extent that such operation is necessary to preserve the value of such Liquidating Trust Assets pending liquidation or to comply with any applicable health, safety, or environmental obligation. Notwithstanding any other section of the Plan or the Liquidating Trust Agreement, it is the express intent that the Liquidating Trust shall survive until such purpose is either achieved or determined to be impracticable or impossible.

3.     Authority of Liquidating Trustee. Subject only to the limitations contained in the Plan, the Confirmation Order, or the Liquidating Trust Agreement, the Liquidating Trustee shall

have, by way of illustration and not limitation, the following duties, responsibilities, authorities, and powers: (A) the power and authority to hold, manage, sell, and distribute the Liquidating Trust Assets in accordance with the Plan, (B) the power and authority to prosecute and resolve all Retained Causes Action, (C) the power and authority to prosecute and resolve objections to Disputed Claims against the Debtors, (D) the power and authority to perform such other functions as are provided in the Plan and Liquidating Trust Agreement.

4.    <u>Priority of Distribution of Liquidating Trust Assets</u>. The Liquidating Trust, through the Liquidating Trustee, shall be responsible for distributing Liquidating Trust Assets, other than the 2017 Chapter 11 Unsecured Creditor Reserve, or the proceeds thereof, in the order of priority shown: (i) to satisfy outstanding, Allowed Priority Non-Tax Claims, if any; then (ii) to satisfy outstanding Allowed Statutory P&A Claims, if any; and then (iii) to satisfy outstanding Allowed General Unsecured Claims, if any.  For the avoidance of doubt, all expenses of the Liquidating Trust that are directly related to the administration of the Liquidating Trust Assets, including, but not limited to the liquidation of the Debtors' oil and gas properties, shall be taxed against the gross proceeds of the Liquidating Trust Assets and shall be satisfied prior to any subsequent Plan Distributions.  Other than the enumerated Claims, no Claims against the Debtors or their Estates shall be charged against the Liquidating Trust.

The Liquidating Trust, through the Liquidating Trustee, shall be responsible for distributing the 2017 Chapter 11 Unsecured Creditor Reserve in accordance with the 2017 Chapter 11 Plan.

5.    <u>Procedure for Distribution of Liquidating Trust Assets</u>. The Liquidating Trustee shall distribute Cash in accordance with the Liquidating Trust Agreement, beginning on the Effective Date or as soon thereafter as is practicable, from the Liquidating Trust Assets on hand (including any Cash received from the Debtors on the Effective Date), except such amounts (i) as would be distributable to a Holder of a Disputed Claim if such Disputed Claim had been Allowed, prior to the time of such Plan Distribution (but only until such Claim is resolved), (ii) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during litigation, (iii) to pay reasonable expenses (including, but not limited to, any taxes imposed on the Liquidating Trust or in respect of the Liquidating Trust Assets), and (iv) to satisfy other liabilities incurred by the Liquidating Trust in accordance with this Plan or the Liquidating Trust Agreement. For purposes of this subsection, (a) Statutory P&A Claims shall be deemed Disputed Claims until such time as any such Claim is liquidated or otherwise Allowed pursuant to Article III, section K of this Plan; and (b) contingent P&A Indemnification Claims shall be deemed Disputed Claims until such time as any such Claim is liquidated or otherwise Allowed pursuant to Bankruptcy Code section 502(c) and all reductions of such Claim pursuant to Article VI section F of this Plan have been applied.

6.    <u>Compensation of the Liquidating Trustee</u>. The Liquidating Trustee shall be entitled to reasonable compensation as set forth in the Liquidating Trust Agreement.

7.    <u>Retention of Professionals by the Liquidating Trustee</u>. The Liquidating Trustee may retain and reasonably compensate counsel and other professionals to assist in his duties as Liquidating Trustee on such terms as the Liquidating Trustee deems appropriate without Bankruptcy Court approval. The Liquidating Trustee may retain any professional who represented parties in interest in these Chapter 11 Cases.

8.      Tax Returns. The Liquidating Trustee shall file all necessary tax returns and other filings with governmental authorities on behalf of the Liquidating Trust and the Liquidating Trust Assets held therein pursuant to the terms of the Liquidating Trust Agreement.

9.      Tax Treatment. For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its Liquidating Trust Beneficiaries.  Accordingly, for federal income tax purposes, it is intended that the Liquidating Trust Beneficiaries be treated as if they had received a distribution from the Debtors' Estates of an undivided interest in each of the Liquidating Trust Assets (to the extent of the value of their respective shares in the applicable assets) and then contributed such interests to the Liquidating Trust, and the Liquidating Trust Beneficiaries will be treated as grantors and owners thereof.

10.      Preservation of Right to Investigate. The preservation for the Liquidating Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the Liquidating Trust Assets.  Accordingly, the Liquidating Trustee shall have the same rights as the Debtors to conduct investigations pursuant to Bankruptcy Rule 2004 as those held by the Debtors prior to the Effective Date. Such powers to investigate pursuant to Bankruptcy Rule 2004 shall vest with the Liquidating Trustee and shall continue until dissolution of the Liquidating Trust.

11.      Termination and Dissolution. The Liquidating Trust shall terminate upon the date on which all of the following events (each, a "Termination Condition," and, collectively, the "Termination Conditions") have occurred: (i) the dissolution of the Post-Effective Date Debtors pursuant to paragraph 3 of Article IV section C of the Plan; (ii) the Liquidating Trust Assets, including Causes of Action transferred and assigned to the Liquidating Trust, are fully resolved, abandoned or liquidated in accordance with the Plan and Liquidating Trust Agreement; (iii) all Cash has been completely distributed in accordance with the Plan and Liquidating Trust Agreement; (iv) all tax returns and any other filings or reports have been filed with the appropriate state or federal regulatory authorities; and (v) the order closing the Chapter 11 Cases is a Final Order.  Upon the occurrence of each of the foregoing events, the duties, responsibilities and powers of the Liquidating Trustee shall terminate, and the Liquidating Trustee shall be discharged.  Except in the circumstances set forth below, the Liquidating Trustee shall dissolve the Liquidating Trust in accordance with the provisions of this section no later than five (5) years after the Effective Date in accordance with applicable IRS revenue procedures.

The Bankruptcy Court may extend the term of the Liquidating Trust one or more times (not to exceed a total of four extensions, unless the Liquidating Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) for a finite period upon a showing of good cause and based on the particular circumstance at issue.  Each such extension must be approved by the Bankruptcy Court with notice thereof to all unpaid Liquidating Trust Beneficiaries.

Notwithstanding any other section of the Plan or the Liquidating Trust Agreement, it is the express intent that the Liquidating Trust shall survive until each of the Termination Conditions have either occurred or determined to be impracticable or impossible.  To the extent that the Liquidating Trust shall be deemed terminated pursuant to applicable law at any time prior to the occurrence of each Termination Condition, the Liquidating Trustee shall not be discharged, but

shall have such "wind-up" powers, both express and implied, as are necessary to achieve all outstanding Termination Conditions, including, but, not limited to the authority to (i) continue prosecuting any Causes of Action belonging to the Liquidating Trust; (ii) continue Claim administration responsibilities set forth in Article VI section B paragraph 2 of the Plan; and (iii) distribute the Cash proceeds of the Liquidating Trust Assets in a manner consistent with the Liquidating Trust Agreement.  In no event shall the Liquidating Trust Beneficiaries be entitled to receive in-kind distributions of the Liquidating Trust Assets.

**E.**     **Plan Funding**

Plan Distributions of Cash shall be funded solely from the Debtors' Cash on hand as of the Effective Date and not from other sources, including, for the avoidance of doubt, any Talos Shares, proceeds of, or recoveries on account of, the Apache Claims, or Cash constituting the Secured Cash Amount transferred to Lender NewCo.

**F.**     **Abandonment of Certain Assets**

Immediately upon the occurrence of the Effective Date, the Debtors' rights to and interests in executory contracts and unexpired federal leases, rights-of-way, and right-of-use-and-easements listed on the Schedule of Abandoned Assets are abandoned pursuant to the Plan, in each case, without further notice to or order of the Bankruptcy Court, pursuant to sections 105(a) and 554(a) of the Bankruptcy Code and/or deemed rejected pursuant to section 365 of the Bankruptcy Code, as applicable.  The Abandoned Assets shall not be allocated to nor vest in the Post-Effective Date Debtors or Lender NewCo.  Except as otherwise provided in the Plan or the Confirmation Order, the Debtors, their Estates, Lender NewCo, the Liquidating Trust and the Post-Effective Date Debtors shall not be liable for any obligations whatsoever arising from or relating to the post-Effective Date period with regards to the Abandoned Assets.  Nothing in the Plan or the Confirmation Order shall be construed as barring, waiving, or limiting the United States' rights to assert a claim against the Debtors, the Post-Effective Date Debtors or any co- lessees or predecessors in interest with respect to the Abandoned Assets for any P&A Obligations for the Abandoned Assets.

**G.**     **Closing of Chapter 11 Cases**

After the Effective Date, the Liquidating Trustee shall be authorized, but not directed, to submit an order to the Bankruptcy Court under certification of counsel that is in form and substance acceptable to the UST that closes and issues a final decree for each of the Chapter 11 Cases.

**XII.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.**     **Executory Contracts and Unexpired Leases**

   1.     *General Treatment*.

      (a)     As of and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases to which any of the Debtors are parties shall be deemed rejected, unless such contract or lease (i) was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court; (ii) previously expired or terminated pursuant to its own terms or

by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtors on or before the Confirmation Date; (iv) is identified in the Plan; or (v) is identified for assumption on the Schedule of Assumed Contracts included in the Plan Supplement

(b)     Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Post-Effective Date Debtors have provided adequate assurance of future performance under such assumed Executory Contracts and Unexpired Leases.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan shall vest in and be fully enforceable by the Post-Effective Date Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

(c)     To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

(d)     The Debtors reserve the right, on or before 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the Confirmation Hearing, or such other time as may be agreed in writing between the Debtors and the applicable counterparty, to amend the Schedule of Assumed Contracts to add or remove any Executory Contract or Unexpired Lease; provided that if the Confirmation Hearing is adjourned or continued, such amendment right shall be extended to 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the rescheduled or continued Confirmation Hearing, and this provision shall apply in the case of any and all subsequent adjournments and continuances of the Confirmation Hearing; provided, further that the Debtors may amend the Schedule of Assumed Contracts to add or delete any Executory Contracts or Unexpired Leases after such date to the extent agreed with the relevant counterparties and entry of an order of the Bankruptcy Court.

2.     *Determination of Cure Amounts and Deemed Consent*.

(a)     Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors may otherwise agree.

(b)     The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts.  At least ten (10) days before the Confirmation Hearing, the Debtors shall serve a notice on parties to Executory Contracts or Unexpired Leases to be assumed or assumed and assigned reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with the Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption, assumption and assignment, or related Cure Amount**

33

**must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.** Any counterparty to an Executory Contract or Unexpired Lease that does not timely object to the notice of the proposed assumption of such Executory Contract or Unexpired Lease shall be deemed to have assented to assumption of the applicable Executory Contract or Unexpired Lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor, or any Post-Effective Date Debtor, under such Executory Contract or Unexpired Lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or Post-Effective Date Debtor, as applicable. Each such provision shall be deemed to not apply to the assumption of such Executory Contract or Unexpired Lease pursuant to the Plan and counterparties to assumed Executory Contracts or Unexpired Leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section V.A(2)(b), shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

(c)     If there is an Assumption Dispute pertaining to assumption of an Executory Contract or Unexpired Lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court before such assumption becomes effective; provided, the Debtors or Post-Effective Date Debtors, as applicable, may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)     To the extent an Assumption Dispute relates solely to the Cure Amount, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease before the resolution of the Assumption Dispute; provided, that the Post-Effective Date Debtors shall be responsible to pay the determined amount to be Allowed by the Bankruptcy Court or otherwise agreed to by such non-Debtor party. The Debtors or Post-Effective Date Debtors, as applicable, may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(e)     Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Any POC filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Person, upon the assumption of such Executory Contracts or Unexpired Leases.

**B.**     <u>Insurance Policies</u>

Notwithstanding any other provision of the Plan or Plan Documents, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto are expressly assumed by the Debtors and assigned to Liquidating Trust. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or the Liquidating Trust may hold against any Person or Entity related thereto.

**C.**     <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases</u>

Except as otherwise provided by the Bar Date Order or other Final Order of the Bankruptcy Court, all Proofs of Claim, with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the later of: (i) the date of entry of any order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (ii) the effective date of such rejection; (iii) the Effective Date; or (iv) the date after the Effective Date that the applicable Schedules are altered, amended, modified, or supplemented, but only with respect to any Executory Contract or Unexpired Lease thereby affected. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Post-Effective Date Debtors, the Estate, or their property without the need for any objection by the Post-Effective Date Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified and treated as Class 4 (General Unsecured Claims) Claims.

**D.**     <u>Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases</u>

Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Liquidating Trustee under any executory or non-executory contract or unexpired or expired lease. Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors, the Liquidating Trust, or the Post-Effective Date Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors expressly reserve for the Liquidating Trust and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtors counterparties to rejected Executory Contracts or Unexpired Leases.

**E.**     <u>Reservation of Rights</u>

Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Post-Effective Date Debtors, as applicable,

under any executory or non-executory contract or unexpired or expired lease.  Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Contracts, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Liquidating Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan.

## XIII.
## CLAIM/INTEREST OBJECTION PROCEDURES, TREATMENT OF DISPUTED CLAIMS/INTERESTS AND PROCEDURE FOR ASSERTING CLAIMS

**A.**     **Objection Process**

Except insofar as a Claim is Allowed under the Plan, only the Debtors or the Liquidating Trustee, as applicable, shall be entitled to object to Claims.  Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Liquidating Trustee shall have the exclusive authority (a) to file, withdraw, or litigate to judgment objections to Claims; (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Debtors' claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

**B.**     **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.     *Record Date for Distribution.*  As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents shall be closed, and neither the Debtors, the Liquidating Trustee nor their respective agents shall be required to make any further changes in the record Holders of any of the Claims or Interests.  The Debtors and Liquidating Trustee shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.  The Debtors and the Liquidating Trustee shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

2.     *Delivery of Distributions in General.*  Except as otherwise provided herein, the Liquidating Trustee shall make Plan Distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution: *provided, however,* that the manner of such Plan Distributions shall be determined at the discretion of the Liquidating Trustee; *provided further, however*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim or Proof of Interest filed by that Holder.

3.  *Minimum Distributions.*  To the extent Cash is distributed under the Plan or the Liquidating Trust Agreement, no Cash payment of less than $50.00 shall be made to a Holder on account of any Allowed Claim or Interest, and such amounts shall be retained by the Post-Effective Date Debtors.

4.  *Request for Tax Forms; Undeliverable Distributions; and Unclaimed Property.* Prior to making any Plan Distributions required under the Plan or the Liquidating Trust Agreement, the Liquidating Trustee may request that Holders provide an executed Form W-9 or Form W-8 as appropriate ("Request for Tax Form").  In the event that any Holder fails to execute and return such Request for Tax Form within a reasonable time or if a Request for Tax Form is returned as undeliverable (and the Liquidating Trustee is unable after reasonable efforts to determine the then-current address of such Holder), such Plan Distributions shall be deemed unclaimed property.

Further, if a Plan Distribution is returned as undeliverable, no further Plan Distributions to such Holder will be made unless and until the Liquidating Trustee is notified in writing of such Holder's then current address.

Except as otherwise provided in the Plan, Plan Distributions on account of Disputed Claims shall be withheld by the Liquidating Trustee until such Claims have been either Allowed or disallowed.  To the extent a Disputed Claim becomes Allowed any Plan Distribution reserved for such Claim shall be distributed to the Holder thereof.  To the extent a Disputed Claim becomes disallowed, the Plan Distribution reserved for such Claim shall revert to the Liquidating Trust automatically and without need for a further order by the Bankruptcy Court.

## C.    **Distributions to Holders of Disputed Claims**

Except as otherwise provided in the Plan, distributions on account of Disputed Claims shall be withheld by the Liquidating Trustee until such Claims have been either Allowed or Disallowed. To the extent a Disputed Claim becomes Allowed any Plan Distribution reserved for such Claim shall be distributed to the Holder thereof.  To the extent a Disputed Claim becomes Disallowed, the Plan Distribution reserved for such Claim shall revert to the Liquidating Trust automatically and without need for a further order by the Bankruptcy Court.

## D.    **Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

## E.    **Setoffs and Recoupment**

Except as expressly provided in the Plan, or otherwise ordered by the Bankruptcy Court, the Liquidating Trustee may, pursuant to section 553 of the Bankruptcy Code, withhold, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim or Interest, any and all claims, rights, and Causes of Action, including contingent or unliquidated claims, that the Debtors or the Liquidating Trust may hold against the Holder of such Allowed

Claim or Interest; *provided, however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Liquidating Trust or its successor of any and all claims, rights, and Causes of Action that the Debtors, the Liquidating Trust, or their successor may possess against the applicable Holder.  In no event shall any Holder of Claims against, or Interests in, the Debtors be entitled to recoup any such Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Post-Effective Date Debtors, as applicable, unless such Holder has actually performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XVIII section E of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

**F.      Claims Paid or Payable by Third Parties**

1.      *Claims Paid by Third Parties.* The Debtors or the Liquidating Trustee, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors or Liquidating Trustee, including, for the avoidance of doubt any payment from the proceeds of any insurance policy purchased by or for the benefit of the Debtors or the Debtors' officers and directors, if any.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from a party that is not the Debtors or Liquidating Trustee, such Holder shall, within fourteen (14) days of receipt thereof, repay or return any Plan Distribution received from the Liquidating Trustee to the extent the Holder's total recovery exceeds the amount such Holder was entitled to receive under the Plan on account of the Claim.  The failure of such Holder to timely repay or return such Plan Distribution shall result in the Holder owing the Liquidating Trustee annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      *Claims Payable by Third Parties*.  No Plan Distributions under the Plan shall be made on account of an Allowed Claim that is payable under any insurance policy purchased by or for the benefit of the Debtors or the Debtors' officers and directors until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent the underlying claim forming the basis of the Claim against the Debtors is adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement to satisfy all or part of the Claim, the applicable portion of such Claim against the Debtors shall be deemed expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      *Application of Insurance Policies*.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**G.      Estimation of Claims and Interests**

Before or after the Effective Date, the Debtors or the Liquidating Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Debtors, the Liquidating Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.

## H.     Adjustment to Claims or Interests Without Objection

Any duplicate Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Liquidating Trustee without any further notice to or action, order, or approval of the Bankruptcy Court.

## I.      Disallowance of Claims or Interests

Except as otherwise specifically provided in the Plan, any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any Plan Distributions on account of such Claims until such time as any objection to those Claims or Interests have been settled or a Bankruptcy Court order with respect thereto has been entered.

Except as provided herein or otherwise agreed, any and all Proofs of Claim or Proofs of Interest filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely filed by a Final Order.

## J.      Amendments to Claims or Interests

On or after the Effective Date, a Claim or Interest may not be filed or amended without the prior authorization of the Bankruptcy Court or the Liquidating Trustee and any such new or amended Claim or Interest filed shall be deemed disallowed in full and expunged without any further action.

## XIV.   EFFECT OF CONFIRMATION

### A.    Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Plan Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest Holder may have with respect to any Allowed Claim or Allowed Interest or any Plan Distribution to be made on account of such Allowed Claim or Allowed Interest.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Allowed Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of such Allowed Claims and Allowed Interests, and is fair, equitable, and reasonable.

### B.    Legally Binding Effect

The provisions of the Plan shall bind all creditors and Interest Holders, whether or not they accept the Plan. On and after the Effective Date, all Holders of Claims shall be precluded and enjoined from asserting any Claim (i) against the Debtors or their Assets or properties based on any transaction or other activity of any kind that occurred prior to the Confirmation Date; and (ii) any derivative claims, including claims against third parties asserting alter ego claims, fraudulent transfer claims or any other type of successor liability.

### C.    Release of Liens

Except as otherwise provided in the Plan, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable Plan Distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Liquidating Trust and its successors and assigns.  On and after the Effective Date, any Holder of such Secured Claim (and the applicable agents for such Holder), at the expense of the Liquidating Trust, shall be authorized and may be directed to release any Collateral or other property of either Debtors (including any Cash Collateral and possessory Collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Liquidating Trustee to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.  For the avoidance of doubt, this Section shall not apply to those certain Liens held by any Governmental Unit for amounts owed by the Debtors for taxes, including, but not limited to, *ad valorem* property taxes, unless and until such tax Claims have been paid in full.

## D.    Limited Discharge of Debtors and Injunction

The Confirmation Order will operate as a general resolution with prejudice, as of the Effective Date, of all pending legal proceedings, if any, against the Debtors and their Assets and properties and any proceedings not yet instituted against the Debtors or their Assets and properties, except as otherwise provided in the Plan.  Except as otherwise expressly provided in the Plan or the Confirmation Order, all Persons who have held, hold, or may hold Claims against the Debtors are permanently enjoined on and after the Effective Date from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Liquidating Trust, or their property, with respect to any such Claim, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order with respect to any such Claim against the Debtors or the Liquidating Trust, or their property, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Liquidating Trust, or their property, with respect to such Claim, (d) asserting any right of subrogation of any kind against any obligation due to the Debtors or the Liquidating Trust, or the property of the Debtors, the Estates or the Liquidating Trust with respect to any such Claim or (e) asserting any right of setoff or recoupment against the Debtors, the Estates or the Liquidating Trust.  Unless otherwise provided in the Plan or by order of the Bankruptcy Court, all injunctions or automatic stays provided for in this case pursuant to section 105, if any, or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date will remain in full force and effect until entry of a final decree in these Chapter 11 Cases.

## E.    Channeling Injunction

In addition to the injunction set forth in Section D above, upon Confirmation of the Plan, all creditors of the Debtors shall be permanently enjoined, pursuant to section 105 of the Bankruptcy Code, from proceeding against any other obligor, co-debtor, or guarantor for the collection of all or any portion of a Claim against the Debtors, whether Allowed or not.  Such injunction shall remain in effect as to each Class of Caims under this Plan only for so long as the Liquidating Trustee complies with the terms of the Plan regarding payment for such Class.  Any violation of the Plan that remains uncured for thirty (30) days after receipt by the Liquidating Trust of written notice from any party affected by such violation shall, without order of the Bankruptcy Court, automatically result in the dissolution of the injunction granted hereunder as to the affected party.

## F.    Releases by the Debtors

**AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, AND THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED, BY THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES AND ANY AND ALL OTHER PERSONS THAT MAY PURPORT**

**TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING PERSONS, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, AND CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THE ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER ARISING, WHETHER IN LAW OR EQUITY, WHETHER SOUNDING IN TORT OR CONTRACT, WHETHER ARISING UNDER FEDERAL OR STATE STATUTORY OR COMMON LAW, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE, STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENTS OR OTHERWISE THAT THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

**ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION VII.F. OF THE PLAN (the "DEBTOR RELEASES"), WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE: (I) IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE RELEASED CLAIMS RELEASED BY THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS AND THE ESTATES, (IV) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS, (V) FAIR, EQUITABLE AND REASONABLE, (VI) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VII) A BAR TO ANY OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT**

TO THE DEBTOR RELEASE.

G.     **RELEASES BY HOLDERS OF CLAIMS AND INTERESTS**

**AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER, AND THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED, TO THE MAXIMUM EXTENT PERMITTED BY LAW, AS SUCH LAW MAY BE EXTENDED SUBSEQUENT TO THE EFFECTIVE DATE BY THE RELEASING PARTIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, INCLUDING ANY CAUSES OF ACTION ARISING UNDER CHAPTER 5 OF THE BANKRUPTCY CODE), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ASSERTED OR UNASSERTED, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, WHETHER ARISING UNDER FEDERAL OR STATE, STATUTORY OR COMMON LAW, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENT OR OTHERWISE, THAT SUCH HOLDERS OR THEIR ESTATES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE POST-EFFECTIVE DATE DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

**ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT**

SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION VII.G. OF THE PLAN (THE "THIRD-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD, VALUABLE AND ADEQUATE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

**H.    Exculpation**

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EXCEPT FOR THE RIGHTS THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN, THE CONFIRMATION ORDER AND THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, NO EXCULPATED PARTY WILL HAVE OR INCUR, AND EACH EXCULPATED PARTY WILL BE RELEASED AND EXCULPATED FROM, ANY CLAIM, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, REMEDY LOSS, LIABILITY AND CAUSE OF ACTION IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE NEGOTIATION AND PURSUIT OF DEFINITIVE DOCUMENTS, THE DISCLOSURE STATEMENT, THE PLAN (INCLUDING THE PLAN SUPPLEMENT), AND ALL DOCUMENTS RELATING TO THE FOREGOING, OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THE PLAN; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF AN EXCULPATED PARTY THAT CONSTITUTES INTENTIONAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER, BUT IN ALL RESPECTS SUCH PERSONS WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION OF THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS WILL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.  THE EXCULPATION WILL BE

**IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.**

## I.      Preservation of Claims and Rights

Confirmation of the Plan effects no settlement, compromise, waiver or release of any Claim, Cause of Action, Right of Action or claim for relief unless the Plan or the Confirmation Order specifically and unambiguously so provides. **Exhibit A** of the Plan describes (i) those Claims, Causes of Action, Right of Action or claims (the "Retained Causes of Action") for relief currently known to the Debtors; and (ii) circumstances currently known to the Debtors that may give rise to a Claim, Cause of Action, Right of Action or other claim for relief. All Claims, Causes of Action, Rights of Action or claims for relief (including, for the avoidance of doubt, the Apache Claims) are expressly preserved for the benefit of the Debtors' creditors in accordance with the terms of the Plan. The non-disclosure or non-discussion of any particular Claim, Cause of Action, Right of Action or claim for relief is not and shall not be construed as a settlement, compromise, waiver, or release of any such Claim, Cause of Action, Right of Action or claim for relief.

**Except as released in the Plan, Confirmation Order, or previous order of the Bankruptcy Court, the Debtors and the Liquidating Trustee in his capacity as trustee of the Liquidating Trust, reserve any and all claims and rights against any and all third parties, whether such claims and rights arose before, on or after the Petition Date, the Confirmation Date, the Effective Date, the Distribution Record Date and/or any Plan Distribution date, including, without limitation, any and all Causes of Action, Rights of Action and/or claims for relief that the Debtors or the Liquidating Trust may have against (i) any party described or related to the events described in Exhibit A hereto, and (ii) any insurer and/or insurance policies in which either the Debtors have an insurable or other interest in or right to make a claim against, any other of the Debtors' insurers. The entry of the Confirmation Order shall not constitute res judicata or otherwise bar, estop or inhibit any actions by the Liquidating Trustee, in his capacity as trustee for the Liquidating Trust, relating to any claims, Causes of Action or Rights of Action referred to in this Plan, or otherwise. The Liquidating Trustee shall constitute the representative of the Debtors for purposes of retaining, asserting and/or enforcing Rights of Action under section 1123(b)(3)(B) of the Bankruptcy Code. On the Effective Date, the Liquidating Trustee shall be substituted as a party of record in all pending litigation brought by or against any Debtor without need for further order of the Bankruptcy Court.**

## J.      Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (i) such Claim has been adjudicated as non-contingent or (ii) the relevant Holder of a Claim has filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim is no longer contingent.

## XV.   CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.   Conditions Precedent to Effectiveness

The following conditions precedent shall be satisfied, or waived in writing in accordance with section B of this Article, prior to the occurrence of the Effective Date of the Plan:

(a)   The Debtors shall have taken all steps necessary to transfer to Lender NewCo the Secured Cash Amount, the Apache Claims and the Talos Shares in accordance with the Plan immediately upon the occurrence of the Effective Date;

(b)   The Plan Supplement has been filed;

(c)   The Bankruptcy Court shall have entered the Confirmation Order, which order shall be a Final Order;

(d)   All definitive documentation, including all terms and conditions thereof, necessary to effectuate the terms of the Plan shall be in form and substance acceptable to the Required Lenders; and

(e)   The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents (other than any such authorization, consent, regulatory approval, ruling, or document that is customarily obtained or completed after assignment, conveyance or vesting of an applicable asset) that, after giving effect to the entry of the Confirmation Order, are necessary to implement and effectuate the Plan, including Bankruptcy Court approval, and each of the other transactions contemplated hereof, and such authorizations, consents, regulatory approvals, rulings, or documents shall not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable regulatory waiting periods shall have expired.

### B.   Waiver of Conditions

With the prior written consent of the Required Lenders, the conditions precedent to the occurrence of the Effective Date set forth in section A above may be waived, in whole or in part, by the Debtors, without leave of or order of the Bankruptcy Court.  If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court.  If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

### C.   Effect of Failure of Conditions

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (i) constitute a waiver or release of Claims by the Debtors, or any

Holders of Claims or Interests; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Person or Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Person or Entity.

## XVI.   MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A.   <u>Modifications and Amendments</u>

Except as otherwise specifically provided in the Plan, the Debtors reserves the right to modify the Plan whether such modification is material or immaterial and seek Confirmation consistent with the Bankruptcy Code.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, the Debtors expressly reserve their rights to revoke or withdraw, or, to alter, amend, or modify the Plan, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

### B.   <u>Effect of Confirmation on Modifications</u>

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan made pursuant Article IX.A., above, are approved pursuant to Bankruptcy Code section 1127(a) and do not require additional disclosure under Bankruptcy Rule 3019.

### C.   <u>Revocation or Withdrawal of Plan</u>

The Debtors reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts and Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person or Entity.

## XVII.   RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority,

secured or unsecured status, or amount of any Claim or Interest, including the resolution of any requests for payment of any Administrative Claim and the resolution of any objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtors are a party or with respect to which the Debtors may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      Ensure that Plan Distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve all matters related to section 1141 of the Bankruptcy Code;

7.      Enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

8.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Person or Entity with respect to Consummation or enforcement of the Plan;

11.      Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VII hereof and enter such orders as may be necessary to implement or enforce such releases, injunctions and other provisions;

12.      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Plan Distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII section F. hereof;

13.      Enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.      Determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan;

15.      Enter an order concluding or closing, on a temporary or final bases, the Chapter 11 Cases;

16.      Adjudicate any and all disputes arising from or relating to Plan Distributions under the Plan;

17.      Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

18.      Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.      Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.      Hear and determine matters concerning state, local, and federal taxes in accordance with sections 363, 505, and 1146 of the Bankruptcy Code;

21.      Hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article VII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

22.      Enforce all orders previously entered by the Bankruptcy Court; and

23.      Hear any other matter not inconsistent with the Bankruptcy Code.

## XVIII.      MISCELLANEOUS PROVISIONS

### A.    <u>Additional Documents</u>

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Liquidating Trustee, as applicable, and all Holders

of Claims or Interests receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**B.**     **Payment of Statutory Fees**

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by the Liquidating Trust for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed – whichever occurs first.

**C.**     **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of an action by the Debtors with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

**D.**     **Successors & Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**E.**     **Notices**

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including any facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

OKIN ADAMS LLP
Matthew S. Okin
David L. Curry, Jr.
1113 Vine St., Suite 240
Houston, Texas 77002
Tel: 713.228.4100
Fax: 888.865.2118
mokin@okinadams.com
dcurry@okinadams.com

**F.     Entire Agreement**

Except as otherwise indicated, the Plan (including, for the avoidance of doubt, the Plan Documents) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which are deemed merged and integrated into the Plan.

**G.     Exhibits**

All Exhibits and documents attached to the Plan are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the Exhibits and documents are filed, copies of such Exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such Exhibits and documents from the Courts CM/ECF filing system.  To the extent any Exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

**H.     Nonseverability of Plan Provisions**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (iii) nonseverable and mutually dependent.

**I.     Plan Proposed in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have proposed the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code, and, therefore, neither any of such individuals or Entities or the Post-Effective Date Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the proposal of the Plan or participation in the Chapter 11 Cases.

**J.     Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any arguments, including the right to argue that its Claim or Interest should be Allowed in a certain

amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors, or their counsel, or any other Entity, if such agreement was not expressly disclosed in the Plan or papers filed with the Bankruptcy Court prior to the Confirmation Date.

**K.**     **Controlling Document**

In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

**XIX.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES**

**A.**     **Important Notice**

The tax consequences of the Plan to the Debtors and to Holders of Claims and Equity Interests are discussed below.  This discussion of the federal income tax consequences of the Plan to the Debtors and Holders under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended (the "Tax Code"), is provided for informational purposes only.  While this discussion addresses certain of the material tax consequences of the Plan, it is not a complete discussion of all such consequences and is subject to substantial uncertainties.  Moreover, the consequences to a Holder may be affected by matters not discussed below (including, without limitation, special rules applicable to certain types of persons, such as persons holding non-vested stock or otherwise subject to special rules, nonresident aliens, life insurance companies, and tax-exempt organizations) and by such Holder's particular tax situation.  In addition, this discussion does not address any state, local, or foreign tax considerations that may be applicable to particular Holders.

Some of the issues discussed below are complex, and there can be no assurance of the accuracy of this information.  The Debtors' general bankruptcy counsel has no tax expertise and has not researched or analyze tax consequences resulting from the Plan.  Accordingly, please take notice that:

> **HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

**B.**     **Federal Income Tax Consequences to Holders**

The following discussion addresses certain of the material consequences of the Plan to Holders.  Under the Plan, the tax consequences of the Plan to a Holder will depend, in part, on the type of consideration received in exchange for the Claim or Equity Interest and the tax status of the Holder, such as whether the Holder is an individual, corporation or other entity, whether the Holder is a resident of the United States, the accounting method of the Holder, and the tax classification of the Holder's particular Claim or Equity Interest.  For that reason, Holders should consult their own tax advisors with respect to the tax treatment for their particular claims or equity interests. Among the issues the Holders of Claims and/or Equity Interests and their advisors may wish to consider are:

(i)     The extent to which the Holder of a Claim and/or Equity Interest is entitled to a bad debt deduction or a worthless securities loss.

(ii)    The extent to which the Holder of a Claim or Equity Interest recognizes gain or loss on the exchange of its Claim or Equity Interest for property, debt, and stock of the Debtor and the character of that gain or loss.

(iii)   The basis and the holding period for any property, debt, and stock received by the Holder of a Claim or Equity Interest.

(iv)   Whether the original issue discount rules, market discount rule, and amortizable bond premium rules apply to any debt received by the Holder of a Claim or Equity Interest.

(v)    The treatment of property, stock, or debt, if any, received by the Holder of a Claim or Equity Interest in satisfaction of accrued interest.

(vi)   The effect of a Holder of a Claim or Equity Interest receiving deferred distributions or distributions that are contingent in amount.

## C.    <u>Federal Income Tax Consequences to the Debtors</u>

1.    *In General*.  Taxpayers are generally required to recognize taxable income as a result of cancellation of debt.  The receipt of borrowed funds is not subject to tax, on the premise that the debtor will repay them.  If the debt is cancelled without repayment, the recognition of income takes into account a debtor's receipt of the borrowed funds.

Special rules, however, apply to the cancellation of debt in a bankruptcy proceeding. Generally, a debtor in a bankruptcy case is not required to recognize income from the cancellation of debt.  However, the debtor has to pay for this exclusion by reducing specified tax attributes, such as any net operating loss ("NOL") incurred by the taxpayer in the year that the debt discharge occurs, any NOL carryovers to that year, and tax credit and capital loss carryforwards.

2.    *Limitation on NOL Carryforwards and Other Tax Attributes*.  To deter "trafficking" in NOL carryforwards, section 382 of the Tax Code limits a corporation's ability to use losses incurred before an "ownership change" to offset income earned thereafter.  A similar limitation applies to tax credits. In general, an ownership change occurs if more than fifty percent (50%) of the stock of a corporation changes hands within a three-year period.

If an ownership change occurs, the corporation can use pre-change NOL carryforwards to offset only an amount of income each year equal to the value of the stock of the corporation immediately before the ownership change multiplied by a prescribed interest rate.  The limitation is intended to estimate the earning power of the corporation's pool of capital at the time of the ownership change.  The limitation thus prevents the use of pre-change NOL carryforwards to offset income from new capital contributed by the new owners.

Special rules apply, however, in the case of ownership changes that occur in a bankruptcy proceeding.  Under the general rules, the annual limitation usually would be quite low, because

the corporation's stock immediately before the ownership change often has little or no value. Essentially eliminating the NOL carryforwards of a corporation in bankruptcy could hinder the corporation's ability to reorganize successfully, contrary to the goals of the federal bankruptcy laws.  Therefore, Congress provided special bankruptcy rules in section 382.  If an ownership change occurs in bankruptcy, section 382(l)(6) allows the corporation, in computing the annual limitation on the use of NOL carryforwards, to increase its value to reflect the cancellation of claims in the bankruptcy reorganization.  The regulations provide for this result by using as the value of corporation the lesser of the value of its gross assets immediately before the ownership change or the value of its stock immediately thereafter.  This amount is multiplied by the prescribed interest rate to arrive at the annual limitation on the amount of income that can be offset by pre-change NOL carryforwards.

Another special rule, provided in section 382(l)(5), applies if at least fifty percent (50%) of the corporation's stock immediately after the ownership change is owned by persons who were shareholders or creditors of the corporation immediately before the ownership change.  For purposes of computing the fifty-percent threshold, however, stock issued to creditors who own at least five percent (5%) of the corporation's stock after the ownership change is taken into account only if the creditor held its claim for at least eighteen months before filing of the bankruptcy petition or if the claim arose in the ordinary course of the corporation's business and was owned at all times by the same person.  When the conditions of section 382(l)(5) are met, the annual limitation on NOL carryovers does not apply.  Instead, the corporation is required to reduce its NOL carryforwards by the amount of deductions claimed in the prior three years for interest on debt that is exchanged for stock in the bankruptcy reorganization.  The corporation can then use its remaining NOL carryforwards to offset future income without limitation.  Even if the corporation qualifies for the special rule of section 382(l)(5), it can still elect to apply instead the general bankruptcy rule of section 382(l)(6), under which an annual limitation applies, but is computed under special rules taking into account the effect of the cancellation of claims on the value of the corporation.

Any limitation on NOL carryforwards that may result from the ownership change will probably also apply to "built-in" losses and deductions that accrued economically before the ownership change but are not taken into account under tax accounting rules until after the ownership change. For the avoidance of all doubt, the Debtors assert that:

**PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS. THE DEBTORS MAKE THE ABOVE-NOTED DISCLOSURES OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THEY MAY WISH TO CONSIDER. THE DEBTORS CANNOT AND DO NOT REPRESENT THAT THE TAX CONSEQUENCES MENTIONED ABOVE ARE COMPLETELY ACCURATE BECAUSE, AMONG OTHER THINGS, THE TAX LAW EMBODIES MANY COMPLICATED RULES THAT MAKE IT DIFFICULT TO STATE ACCURATELY WHAT THE TAX IMPLICATIONS OF ANY ACTION MIGHT BE.**

## XX.    CONFIRMATION REQUIREMENTS

**A.    Confirmation and Acceptance by All Impaired Classes**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if all of the requirements of Bankruptcy Code section 1129 are met.  Among the requirements for confirmation are that the Plan be accepted by all Impaired Classes of Claims and Equity Interests, and satisfaction of the matters described below.

1.    *Feasibility*.  Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

This Plan specifically provides for the liquidation of the Debtors, and, accordingly, this requirement of confirmation is not applicable.   In addition, the Debtors' working interests are in wells that are co-owned by third parties more financially capable of meeting the P&O Obligations than the Debtors.

2.    *Best Interests Standard*.  The Bankruptcy Code requires that the Plan meet the "best interest" test, which requires that members of a Class must receive or retain under the Plan, property having a value not less than the amount which the Class members would have received or retained if the Debtors were liquidated under Chapter 7 on the same date.  The Debtors believe that distributions to all Impaired Classes of Claims in accordance with the terms of the Plan would far exceed the net distribution that would otherwise take place in Chapter 7.  Therefore, the Debtors submit that the interests of creditors are best served by voting to accept the Plan.

**B.    Confirmation Without Acceptance By All Impaired Classes**

If one or more of the Impaired Classes of Claims or Equity Interests does not accept the Plan, the Plan may nevertheless be confirmed and be binding upon the non-accepting Impaired Class under the "cram down" provisions of the Bankruptcy Code if the Plan does not "discriminate unfairly" and is "fair and equitable" to the non-accepting Impaired Classes under the Plan.

1.    *Discriminate Unfairly*.  The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank.  The Debtors believe that the Plan does not "discriminate unfairly" with respect to any Class of Claims or Equity Interests because no Class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank.

2.    *Fair and Equitable Standard*.  With respect to the Impaired Classes of Unsecured Claims, Bankruptcy Code section 1129(b)(2)(B) provides that a plan is "fair and equitable" if it provides that (i) each holder of a claim of such class receives or retains on account of such claim, property of a value as of the effective date of the plan equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain property under the plan on account of such junior claim or interest.  The Debtors believe that the Plan meets these standards.

The Debtors believe that the requirements of Bankruptcy Code 1129(a) and (b) are met under the Plan. Accordingly, if necessary, the Debtors will seek Confirmation of the Plan under the "cram down" provisions of the Bankruptcy Code and believe it meets the requirements for Confirmation by the Bankruptcy Court notwithstanding a potential non-acceptance by an Impaired Class of Claims.

**C.      Non-Confirmation of the Plan**

If the Plan is not confirmed by the Bankruptcy Court, the Bankruptcy Court may permit the Filing of an amended plan, dismiss the Chapter 11 Cases, or convert the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, the Chapter 7 trustee would have to gain an understanding of the nature of the Causes of Action and pursue such Causes of Action for the benefit of the Estates. The Debtors believe that this would result in unnecessary costs and delay.

## XXI.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (a) alternative plans under Chapter 11 (including a liquidation plan), (b) dismissal of the case, or (c) conversion of the case to a case under Chapter 7 of the Bankruptcy Code.

**A.      Alternative Plans of Reorganization**

If the Plan is not confirmed, the Debtors or, subject to further determination by the Bankruptcy Court as to extensions of exclusivity under the Bankruptcy Code, any other party in interest in the Chapter 11 Cases could attempt to formulate and propose a different plan or plans. Such plans might involve a reorganization, an orderly liquidation of the Debtors' assets, or a combination thereof. The Debtors believe that their Plan will enable creditors to be paid the maximum amount possible for their Allowed Claims.

**B.      Liquidation under Chapter 7 of the Bankruptcy Code**

If the Plan (or any other plan) is not confirmed, the Chapter 11 Cases may be converted to liquidation cases under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtors. The proceeds of the liquidation would be distributed to Holders of Claims and Equity Interests of the Debtors in accordance with the priorities established by the Bankruptcy Code.

In general, the Debtors believes that liquidation under Chapter 7 of the Bankruptcy Code would result in a substantial diminution of the value of the interests of the creditors because of (i) additional administrative expenses involved in the appointment of a trustee and attorneys, accountants and other professionals to assist such trustee; (ii) additional expenses and claims, some of which might be entitled to priority, which would arise by reason of the liquidation; (iii) failure to realize the full value of the Debtors' assets; (iv) the inability to utilize the work product and knowledge of the Debtors and their Professionals; and (v) the substantial delay which would elapse before creditors would receive any distribution on account of their Claims. Accordingly, the Debtors believe that the Plan is far superior to liquidation of the Debtors' assets under Chapter 7.

## XXII.  SUMMARY AND CONCLUSION

The Plan provides for an orderly and prompt distribution to Holders of Allowed Claims and Allowed Equity Interests against the Debtors.  The Debtors believe that their efforts to maximize the return for Holders of Claims and Equity Interests have been full and complete.  The Debtors further believe that the Plan meets the requirements of the Bankruptcy Code and is in the best interests of all creditors.

Respectfully submitted on the 8th day of March, 2021.

**CASTEX ENERGY 2005 HOLDCO, LLC,** *et al.*

By: /s/ *Douglas J. Brickley*
   Douglas J. Brickley
   Chief Restructuring Officer

**OKIN ADAMS LLP**

By: /s/ *Matthew S. Okin*
   Matthew S. Okin
   Texas Bar No. 00784695
   Email: mokin@okinadams.com
   David L. Curry, Jr.
   Texas Bar No. 24065107
   Email: dcurry@okinadams.com
   Ryan A. O'Connor
   Texas Bar No. 24098190
   Email: roconnor@okinadams.com
   Johnie A. Maraist
   Texas Bar No. 24109505
   Email: jmaraist@okinadams.com
   1113 Vine St., Suite 240
   Houston, TX  77002
   Tel: (713) 228-4100
   Fax: (888) 865-2118

**PROPOSED ATTORNEYS FOR THE DEBTORS**

## **Exhibit 1**

Joint Chapter 11 Plan